RUTH SORENSON, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Chicago Board of Education, Appellee).

First District (Industrial Commission Division)   No. 1—95—3068WC

Opinion filed May 17, 1996.—Rehearing denied June 28, 1996.

374

Wiedner & McAuliffe, Ltd., of Chicago (Michael F. Doerries, of counsel), for appellant.

Chicago Board of Education, of Chicago (Michael Cohen and Robert S. Markin, of counsel), for appellee.

JUSTICE RAKOWSKI delivered the opinion of the court:

Claimant, Ruth Sorenson, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 1994)) for injuries to her back that she allegedly sustained on September 12, 1986, while working for the Chicago Board of Education (employer). The arbitrator found that claimant sustained a lumbar strain that arose out of and in the course of her employment. Based on this injury, he awarded claimant $19^4/7$ weeks of temporary total disability (TTD) benefits, $357 in medical expenses, and 10% loss of use of the person as whole, stating "Petitioner's continuing complaints are attributable only in small part to the residual effects of the lumbar strain suffered in 1986." Somewhat contradicting this award, the arbitrator stated earlier in his decision, "there is no causal connection between Petitioner's present state of ill-being and her accident of September 12, 1986." This statement was made before the arbitrator proceeded to discuss claimant's surgery, about which he stated, "Petitioner's surgery was necessitated, according to her treating physician, by the presence of an osteophyte which pressed on the nerve. There is no evidence that such a condition can arise out of the type of injury sustained by Petitioner

in 1986." The arbitrator awarded no benefits for the surgery. The Industrial Commission (the Commission) affirmed, increasing medical benefits to $562. On administrative review, the circuit court of Cook County set aside the Commission's decision on medical expenses, affirmed on all other matters, and remanded on the issue of medical benefits.

On remand, the Commission increased the medical award to $2,751. Although it found that a causal connection exists between the September 12, 1986, accident and petitioner's low back strain, radiculopathy and need for medical care for those conditions, it did not find any causal connection between her osteophyte condition and her employment or need for medical care. In conclusion, the Commission stated, "The Commission finds Petitioner failed to prove her osteophyte condition or need for surgery [was] causally connected to her employment and therefore is not entitled to any medical expenses related to this condition, including the February 1, 1988 laminectomy procedure." The circuit court modified, awarding claimant $3,427.63 in medical benefits. Claimant appeals.

Claimant, a kindergarten teacher for 35 years, was 68 years old on the date of the accident. According to claimant, on September 12, 1986, she was attempting to move a pile of books. As she lifted the books, "[she] felt this sharp pain in the back." Claimant stated the pile weighed 25 to 30 pounds. Claimant continued to work the rest of that day and for approximately one month thereafter. On October 14, 1986, she requested a leave of absence until October 20, 1987. She retired on September 1, 1987, retroactive to June 19, 1987.

Claimant testified to the medical treatment she received, which is detailed below. After receiving treatment in October and November 1986, she still suffered from pain in her back which extended down her left leg. Claimant continued with treatment and in April of 1987, she was not much improved and still had pain in her back going down her left leg. Surgery was performed on February 1, 1988. Following surgery, claimant thought she was getting better; however, the problems returned. She performed home exercises and swam, which relieved the pain temporarily.

At the time of the arbitration, she stated she could no longer do the things she would like to do. She testified she was in constant pain in her back and left leg. She experienced numbness in the left leg, and the front of it had no feeling. She walked off balance and because of this used a cane. She testified that her husband did all the chores around the house.

Claimant first sought treatment on September 24, 1986, 12 days after the accident. She saw Dr. Thomas Gleason, relating the ac-

cident and stating she previously suffered from low back problems that were asymptomatic at the time of the accident. She complained of intermittent pain across the low back, worse on the left, which radiated down her left thigh. She also stated her left leg was weak. Dr. Gleason found decreased sensation over S1. X rays showed mild degenerative disc disease with mild facet sclerosis. He diagnosed lumbar syndrome, probably secondary to strain and arthritis of the lumbar spine.

The X-ray report of September 24, 1986, indicates findings of a narrowing of the interspace between L5-S1, mild degenerative arthritic changes involving the articulating facets of the S1 and L5, more so on the right, and spurs in the margins of the vertebral bodies of the lumbar spine.

Claimant saw Dr. T.S. Wright on October 3, 1986. She gave a history of her accident and stated her problems were worsening. Dr. Wright reviewed the X ray of September 24, 1986, and performed an examination. He diagnosed lumbosacral strain with spasticity of the para spinal erector muscles and mild bilateral sciatic syndrome. He ordered treatment with diathermy. Claimant underwent 10 treatments from October 6 to November 6, 1987. At this time, the records indicate she stopped treatment.

Dr. John Gleason, affiliated with Dr. Thomas Gleason, saw claimant on October 8, 1986. At this time, she walked with no limp. However, his records do note some objective findings. Dr. John Gleason's records from October 16, 1986, render a diagnosis of lumbar strain, arthritis of the lumbar spine, and strain of the right hamstring muscle. On November 5, 1986, claimant complained of numbness and tingling in the left leg. Following an examination, Dr. John Gleason recommended a bone scan, CT scan, and EMG.

On November 12, 1986, claimant underwent a CT scan and bone scan. The CT scan report indicates a narrowing at the L5-S1 disc space. There was a vacuum phenomena at L5-S1 disc space which was compatible with degenerative disc disease. The interpreter additionally stated, "I cannot definitely identify herniated disc disease at L5-S1." He further found a 1.0 cm. sclerotic area in the left side of the body of L5.

The bone scan report showed increased activity in the mid-shaft of the left humerus, no areas of increased activity in the lumbar spine, and some areas of increased activity in the mid-posterior region of the cervical spine.

Dr. David Shenker examined claimant on December 10, 1986. She gave him a history of her accident, her continuing complaints, and her treatment. After an examination, Dr. Shenker informed

claimant she most likely suffered from left S1 radiculopathy on the basis of degenerative disc disease. Because her pain had improved, he recommended no further treatment at this time.

Dr. Frederick Miller examined claimant on January 19, 1987, at employer's request. Claimant complained of a nerve in her left leg twitching, tingling above the knee, numbness, and pain in her back. The doctor stated that none of these subjective complaints were substantiated by objective findings. He opined she could return to work.

On April 29, 1987, Dr. John Gleason again saw claimant, who was favoring her left leg while walking. After noting some objective findings, he recommended she return to Dr. Shenker.

Claimant saw Dr. Shenker on June 3, 1987. Claimant stated that in February she began experiencing a burning sensation over the left anterior thigh. This lasted for a few months. Now, she experiences spasms in the left gastrocnemius muscle, low back pain, and weakness in the left leg. Dr. Shenker opined that her symptoms could be due to radiculopathy. Further, the weakness in her left leg raised the question of spinal stenosis. He recommended further diagnostic testing, in particular, a myelogram, if her condition worsened.

In August 1987, claimant saw Dr. Leonard Kranzler for a neurosurgical evaluation. She related the history of the accident, her persistent problems, and treatment. After reviewing the medical records and reports and conducting an examination, Dr. Kranzler opined that claimant suffered from sciatica on the left. He advised her to have a myelogram and post-myelogram CT scan.

A myelogram and post-myelogram CT scan were performed on October 5, 1987. Two reports are contained in the record for each test: a consultation report and an untitled report. The myelogram consultation report indicates "bulging at the 4-5 and 5-1 disc interspace ***. There are cystic outpouchings along the nerve root sleeves on both the left and the right at the lower three lumbosacral levels. These are felt to represent benign variants."

The untitled myelogram report found "slight medial displacement of the nerve root at the L5-S1 level on the left with very good filling of the nerve root. Correlating these above findings with post myelogram c.t. scan this may be due to a bony spur from the superior facet of S1 on the left."

The untitled CT scan report found narrowing of the intervertebral disc space at L5-S1 with associated vacuum phenomena. "There is a bony spur protruding from the superior facet of S1 on the left into the ventral lateral epidural space with associated slight displacement of the S1 root medially with associated slight compression of the

nerve root sheaths." It also reported moderate to severe facet joint hypertrophy at L5-S1 bilaterally. The CT scan consultation report found a mid-line symmetric bulging of the disc at L5. It states that the nerve root sleeves fill at this level. It further found mild facet joint hypertrophy at this level. At level L5-S1, the interpreter found no bulge or herniation. The impression was: "some facet joint hypertrophy causing slight narrowing of the neural foramina. A herniated disc is not identified."

A note written by Dr. Kranzler on October 8, 1987, after reviewing the above test results, states: "a huge osteophyte at the L5/S1 level on the left which pushes the nerve medially [was found]. Surgery was recommended if the pain and/or weakness persist[s]."

Claimant was admitted by Dr. Kranzler to St. Joseph Hospital on February 1, 1988, for surgery. At this time, the diagnosis was "spinal stenosis." Dr. Kranzler's discharge summary and operative report indicate that both the preoperative and post-operative diagnoses were "spinal stenosis." In his discharge summary, Dr. Kranzler related claimant's accident and subsequent treatment. He stated that "[b]ecause of her persistent symptoms and the failure to improve with the passage of time and conservative treatment, surgery was considered. Risk and indications for considering surgery, especially for the osteophyte noted at the S1 level affecting the nerves roots bilaterally, much worse on the left [were] made clear to her."

Dr. Kranzler rendered post-operative treatment. On February 22, 1988, claimant stated that the pain, numbness, and tingling on the left side had now gone. On April 6, 1988, claimant reported occasional back pain and numbness in her left leg, and that the weakness remained. It was the doctor's impression that claimant was progressing well and should gradually increase her activity. On May 18, 1988, claimant reported she was feeling fine since her last visit. She did have numbness and twitching in her left thigh and foot but denied any back pain.

On October 27, 1988, claimant continued to complain of left ankle tightness and numbness. Her pain had progressively become worse. It was the doctor's impression that claimant had weakness and numbness of her left leg. He recommended either an EMG or myelogram and post-myelogram CT scan.

Dr. Barnett examined claimant in August of 1989. He found objective findings to support claimant's subjective complaints. His diagnosis was herniated disc syndrome (post-operative state); residuals of a low back injury with bilateral sciatic nerve root irritation (post-operative state); flattening of the L4 and L5 disc spaces; and spinal stenosis (hospital records). His report states that claimant sustained

an injury on September 12, 1986, for which she initially received conservative treatment.

> "[A]fter many tests were performed indicating a possible disc involvement surgery was performed. *** At this time a deco-[m]pression laminectomy was performed in the lumber [sic] spine region with bilateral foraminotomy. Diagnoses was made of a spinal stenosis at that time and this was definitely preexisted to her accident, however, caused her no problems prior to her accident. As a result the trauma which she sustained on 9-12-86 most likely aggravated this condition setting off the sequence of symptoms and findings which eventually led to the surgery performed on her back region on 2-1-88."

It was the doctor's opinion that "the injury of 9-12-86 was the cause of this patient's low back problem necessitating the surgery which she required."

Dr. Clohisy examined claimant at employer's request on August 12, 1989. Claimant stated she felt the same now as before surgery. X rays showed general dimeralization of the bony structures that was compatible with osteomalacia. The L5-S1 interspace was very thin and he observed some sclerotic changes in the facets of L4-L5. Dr. Clohisy stated that no further treatment was needed.

The arbitrator, in finding that claimant failed to prove a causal connection between the surgery and the accident, rejected the testimony of Dr. Barnett, finding it "fatally flawed by his apparent lack of understanding of Petitioner's course of treatment. *** [I]t is evident from the entire record that no doctor found and no test demonstrated that Petitioner had a herniated disc at any level." Further, it relied on the fact that neither Dr. Kranzler, Dr. Gleason, nor Dr. Shenker attributed claimant's ongoing complaints to the accident.

On review, the Commission found a causal connection between the back strain and radiculopathy and the accident, but no causal connection between the osteophyte and accident. It relied on the records of Drs. Wright and Gleason in determining TTD benefits and on Dr. Barnett's report, not Dr. Clohisy's, in determining the nature and extent of claimant's injury.

Claimant first argues that the issue before this court is a question of law since the evidence clearly shows her preexisting back condition was asymptomatic prior to the accident and, therefore, only one inference can be drawn: that any condition or symptoms subsequent to the accident are causally connected to it.

Initially, there is little evidence in the record detailing claimant's preexisting condition. Dr. Thomas Gleason's records from September 24, 1986, merely state claimant suffered from a preexisting back

condition. Dr. Barnett states that claimant's spinal stenosis preexisted the accident. In her reply brief, claimant states that the accident "produced a lumbar strain, and caused a pre-existing asymptomatic osteophyte to compress the S1 nerve root and produced radiculating symptoms," without citation to the record to support this statement.

■ Generally, questions of causal connection are questions of fact. "If, however, the evidence is undisputed, the question may become a question of law, and the appellate court need not defer to the Commission's determination of a question of law. [Citations.] However, even though the facts are undisputed, a question of fact remains if conflicting inferences may reasonably be drawn from the undisputed facts." *Metropolitan Water Reclamation District v. Industrial Comm'n*, 272 Ill. App. 3d 732, 734 (1995).

There is no dispute that claimant sustained an injury on September 12, 1986. However, the medical records show there is a dispute as to the type of injury claimant suffered and whether it resolved or not. Dr. Gleason diagnosed claimant with lumbar syndrome, probably secondary to strain (accident) and arthritis of the lumbar spine (one would assume a degenerative condition). An initial X ray showed degenerative arthritic changes. Dr. Wright diagnosed claimant with lumbosacral strain with spasticity of the para spinal erector muscles (probably due to accident) and mild bilateral sciatic syndrome (this would appear to be due to a herniated disc). Dr. John Gleason diagnosed claimant with lumbar strain (accident), arthritis of the lumbar spine (degenerative), and strain of the right hamstring (etiology unknown). Claimant's CT scan showed degenerative disc disease and Dr. Shenker diagnosed radiculopathy on the basis of degenerative disc disease. Finally, Dr. Kranzler diagnosed claimant with sciatica (generally due to herniated disc). However, his diagnosis appears to have changed at the time of the surgery.

■ Clearly, different inferences may be adduced from the aforementioned facts. For example, what caused the osteophyte—trauma or degenerative conditions? Was the osteophyte preexisting? Did the accident aggravate the osteophyte if it was preexisting? What caused claimant's problems—the osteophyte or a herniated disc? Did the osteophyte impinge on the nerves? What caused the spinal stenosis—trauma or degenerative conditions? The evidence shows that the various physicians did not agree on what claimant suffered from; what necessitated her surgery—osteophyte, spinal stenosis, or a herniated disk; and did not agree whether she suffered from problems after the surgery. As a result, claimant's contention that the question is one of law is without merit.

■ Claimant next contends that the Commission's finding that she failed to prove a causal connection was against the manifest weight of the evidence because the accident aggravated a preexisting condition from which she was asymptomatic prior to the accident. She sets forth three specific bases. First, the Commission ignored the unrebutted testimony of claimant that she was in good health, able to work, and suffered no problems prior to the accident. Subsequent to the accident, she continually complained of back pain, numbness, weakness, and burning during the two-year course of treatment. She relies on *International Harvester v. Industrial Comm'n*, 93 Ill. 2d 59 (1982), for the proposition that her testimony alone can establish a causal connection.

We stated in *International Harvester* that "[a] chain of events which demonstrates a previous condition of good health, an accident, and a subsequent injury resulting in disability *may be sufficient* circumstantial evidence to prove a causal nexus between the accident and the employee's injury" and that "[w]hen the claimant's version of the accident is uncontradicted and his testimony unimpeached, his recital of the facts surrounding the accident may be sufficient to sustain an award." (Emphasis added.) *International Harvester*, 93 Ill. 2d at 63-64. In that case, however, the court found a causal connection based on claimant's testimony *and* medical evidence she introduced. Thus, it was not her testimony alone that the Commission relied on.

Second, claimant argues that the Commission failed to consider the unrebutted medical evidence that the injury aggravated a prior condition and necessitated the surgery. None of her treating physicians, Dr. Gleason, Dr. Wright, Dr. Shenker, or Dr. Kranzler, attributed her problems to any other incident. According to claimant, her work injury only need be *a* cause of her condition of ill-being, not the sole cause.

This contention is without merit. Of all the medical opinions in evidence, only Dr. Barnett's states that claimant's injury of September 12, 1986, aggravated a preexisting condition. The only other time a preexisting condition is mentioned is summarily in Dr. Thomas Gleason's office notes from September 24, 1986. Many of the medical records, testing, and diagnoses state or imply that claimant suffered from a degenerative condition and do not discuss any aggravation.

■ Finally, claimant contends that the Commission inexplicably discounted the unrebutted testimony of Dr. Barnett regarding causal connection. She first argues that because this is the only medical testimony on the issue, the Commission *cannot* discount it. She relies

on *Kerz v. Industrial Comm'n*, 51 Ill. 2d 319 (1972), *Dean v. Industrial Comm'n*, 143 Ill. App. 3d 339 (1986), *Phillips v. Industrial Comm'n*, 187 Ill. App. 3d 704 (1989), and *Montgomery Elevator Co. v. Industrial Comm'n*, 244 Ill. App. 3d 563 (1993). As to the Commission's finding that Dr. Barnett's opinion was "fatally flawed," she contends that the Commission mischaracterizes his statement. She contends that Dr. Barnett never diagnosed her condition as a disc herniation.

The cases cited by claimant can be distinguished. In *Kerz*, the court stated that the Commission's decision was against the manifest weight of the evidence. Although the court notes that Dr. Black's testimony was unrebutted, the court does not say that, as a matter of law, Dr. Black's testimony had to be accepted. *Kerz* merely stands for the proposition that, in that case, the court found, based on the testimony of claimant's son, claimant's wife, and Dr. Black, that the opposite conclusion was clearly apparent.

*Phillips* contains the correct statement of law that testimony must not only be *unrebutted* but it must be *sufficient* to support a finding of causal connection.

In *Montgomery Elevator* all the court said was that the Commission's decision was against the manifest weight of the evidence based on all the evidence introduced.

In *Dean*, the majority found that the Commission's decision was against the manifest weight of the evidence. This decision was based in part on the fact that claimant's physician's testimony was unrebutted. The fact that testimony is unrebutted *may* be a factor in determining that a decision is against the manifest weight of the evidence. However, it is not an absolute standard. We disagree with the statements in *Dean* stating otherwise. In particular:

> "Therefore, the Commission legally erred by arbitrarily discounting the testimony of the sole medical expert on causation. [Citation.]
>
> The company failed to rebut the occurrence facts and medical conclusions which indicated that the petitioner's pre-infarction syndrome was a compensable injury. Thus, the facts supporting causation were susceptible of only one inference. Therefore, the issue became one of law." *Dean*, 143 Ill. App. 3d at 345.

The *Dean* majority also stated that "[t]he uncontroverted medical evidence indicates that the petitioner succumbed to the stress and physical activities of his employment. Thus, the petitioner's condition is causally connected to his compensable injury." *Dean*, 143 Ill. App. 3d at 346. We disagree with these statements in that the latter does not necessary follow from the former.

The dissent in *Dean* is persuasive. Justice Webber is correct in stating:

"What is more important is a basic legal doctrine that a trier of fact, whether a jury, court, arbitrator, or Commission, is always free to disbelieve any witness. If the theory be sound that the trier of fact is bound by unrebutted testimony, then an arbitrator would be forced to find that the earth is flat if such testimony were presented." *Dean*, 143 Ill. App. 3d at 346 (Webber, P.J., dissenting).

In conclusion, Justice Webber stated that "the arbitrator was thoroughly at liberty to disregard [the physician's] statement that the petitioner was totally disabled on May 20. Otherwise, every infarct could be retroactively related to the workplace no matter how remote in time it might occur." *Dean*, 143 Ill. App. 3d at 346 (Webber, P.J., dissenting).

Thus, although we do not disagree with the finding in *Dean* that the Commission's decision was against the manifest weight of the evidence, we disagree with that language which states that the Commission must accept unrebutted testimony. This is not to say that an arbitrator or the Commission may arbitrarily reject the testimony of witnesses, including medical witnesses. In the instant case, however, the arbitrator gave specific and legitimate reasons for rejecting the testimony of Dr. Barnett which we do not believe were arbitrary.

Based on the above, the Commission's decision finding no causal connection between claimant's surgery and the accident was not against the manifest weight of the evidence.

Claimant's next contention is that she is entitled to TTD benefits through October 27, 1988, not January 27, 1987 (the date of Dr. Miller's examination), because she did not reach maximum medical improvement until that time. Her treating physicians had not returned her to work, which fact the Commission should give due deference to because these doctors were treating physicians.

■ The time period of TTD is a question of fact for the Commission, and its decision should not be disturbed unless it is against the manifest weight of the evidence. *Nabisco Brands, Inc. v. Industrial Comm'n*, 266 Ill. App. 3d 1103, 1109 (1994). "Temporary total disability is to be awarded for the period of time from when an injury incapacitates an employee to the date the employee's condition has stabilized or the employee has recovered as far as the character of the injury will permit. [Citations.] An award for temporary total disability is justified even though the incapacity does not immediately follow an injury as long as the incapacity is directly traceable to, and the result of, the injury." *Whitney Productions, Inc. v. Industrial Comm'n*, 274 Ill. App. 3d 28, 30 (1995).

The arbitrator cut off TTD benefits on January 27, 1987, the date

of Dr. Miller's examination. The decision states: "It is unclear from the medical evidence whether Petitioner's continuing disability from December of 1986 through June of 1987, was due to residual effects of the lumbar strain she sustained as a result of the accident or the effects of the osteophyte." Because Dr. Miller stated claimant could return to her employment, the arbitrator chose that date. The Commission relied on the records of Dr. Wright and Dr. Gleason.

Neither Dr. Wright nor Dr. Gleason had returned claimant to work as of January 27, 1987. Dr. Shenker advised, however, in December 1986, that no further treatment was prescribed at that time because claimant's back pain had improved. After seeing Dr. Miller, claimant did not see another doctor for three months.

■ The determination of whether an employee is temporarily totally disabled is a question of fact and we will not disturb that decision unless it is against the manifest weight of the evidence. *Palmer House v. Industrial Comm'n*, 200 Ill. App. 3d 558, 564 (1990). In this case, a contrary result is not clearly apparent and there was evidence to support the Commission's determination that claimant's TTD benefits should terminate on January 27, 1987. The records of Dr. Shenker state that as of December claimant's pain had improved and he prescribed no further treatment. The next doctor claimant saw was Dr. Miller, who stated claimant could return to her full duties as a teacher. Claimant did not see another doctor for three months after this examination. Thus, there was evidence in the record that claimant had stabilized and the Commission's decision is not against the manifest weight of the evidence.

■ Claimant's final contention is that the Commission's award of 10% disability to the person as a whole must be set aside. In rendering its decision, the Commission stated that it relied on Dr. Barnett's opinion. According to claimant, Dr. Barnett stated that claimant suffered a "major loss" and, therefore, 10% was insufficient. Further, the Commission ignored her testimony regarding her complaints and limitations. Claimant cites to *Palmer House v. Industrial Comm'n*, 200 Ill. App. 3d 558 (1990), arguing that the facts in that case mirror those here and in that case an award of 80% was affirmed.

In *Palmer House*, claimant suffered from preexisting and degenerative back problems. She then sustained an injury to her back. The Commission found she was 80% disabled to the person as a whole. In affirming this finding, the court stated, "we note that the medical evidence regarding the degree and severity of her condition was conflicting, it was the Commission's place to resolve these conflicts. [Citation.] *Under the facts of this case*, we find that the Commission's conclusion *** was not against the manifest weight of

the evidence." (Emphasis added.) *Palmer House*, 200 Ill. App. 3d at 565.

The Commission gave claimant 10% disability due to the lumbar strain and resultant limitations on claimant. It is within the province of the Commission to determine the nature and extent of claimant's injury and we will not disturb that decision absent an abuse of discretion. *Schmidgall v. Industrial Comm'n*, 268 Ill. App. 3d 845, 849 (1994). As the court clearly put it in *Palmer House*, it is the Commission's duty to determine the degree of disability, which it did based on the evidence before it. We cannot say that its decision is against the manifest weight of the evidence.

For the foregoing reasons, the decision of the circuit court of Cook County is affirmed.

Affirmed.

McCULLOUGH, P.J., and COLWELL, HOLDRIDGE, and RARICK, JJ., concur.