JOE FICKAS, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Evans Construction, Appellee).

Fourth District   No. 4—98—0818WC

Argued June 15, 1999.—Opinion filed October 22, 1999.

HOLDRIDGE, J., dissenting.

Todd A. Strong, of Warren E. Danz, P.C., of Peoria, for appellant.

Karen L. Kendall and Brad A. Elward, both of Heyl, Royster, Voelker & Allen, of Peoria, and Gary L. Borah, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Claimant, Joe Fickas, appeals an order of the circuit court of Sangamon County affirming a finding of the Industrial Commission (Commission) that claimant's cubital tunnel syndrome was not causally related to his work-related accident. Claimant maintains that the Commission's decision was against the manifest weight of the evidence. We affirm.

Claimant worked as a construction worker for respondent, Evans Construction. He suffered on-the-job injuries when he fell from a scaffold in July 1996 and subsequently filed an application for adjustment of claim against respondent pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 et seq. (West 1996)). An arbitration hearing was held in September 1997 at which the following evidence was introduced.

On July 2, 1996, claimant, working on a project for respondent, stood on scaffold three or four stories above ground. The scaffold was comprised of four long boards. As claimant attempted to walk from one end of the scaffold to the other, he stepped on a loose board which dropped under his foot. Consequently, the other end of the board shot up "like a teeter-totter" and hit him in the face. He began to fall from the scaffold but somehow caught himself. However, since the blow to the face caused him to black out, claimant could not remember exactly how he caught himself. He continued working for 15 to 30 minutes after the accident but went home when his right arm began feeling numb. He had difficulty sleeping that night.

The following morning, claimant went to the emergency room at St. John's Hospital, where he received treatment to his right shoulder. The emergency records state: "The patient is a 30-year-old white male

who *** came in complaining of severe pain in his right shoulder after somehow twisting his right shoulder while falling through a scaffold at work. He stated he felt sudden intense pain at the time."

Claimant visited Dr. John Meyer, his family doctor, on July 8. Dr. Meyer's notes indicated that claimant complained of right arm and shoulder pain and tingling in the first three digits of his right hand. Dr. Meyer referred claimant to Dr. Michael Watson, an orthopedic surgeon, and would not see claimant again until December 20, 1996.

Dr. Watson examined claimant on numerous occasions between July 30, 1996, and June 12, 1997. Dr. Watson's records revealed that claimant persistently complained of pain in his right shoulder and that claimant was unable to elevate his right arm for several months after the accident. By September 17, 1996, claimant continued to experience pain in his right shoulder. Dr. Watson's medical notes from that day stated: "The pain will occasionally start at the anterior aspect of the shoulder and it will occasionally start at the neck level. The pain will often shoot down the arm into the forearm region." Dr. Watson suspected that claimant suffered from a stretching of his right brachial plexus, which is a convergence point in the shoulder for nerves which run to the chest, shoulder, and arm.

Dr. Watson referred claimant to Dr. Edward Trudeau for an electromyogram (EMG). Dr. Trudeau performed the EMG and a nerve conduction study on September 18, 1996, and confirmed from those tests that claimant had a right brachial plexopathy. The EMG did not reveal any signs of cubital tunnel syndrome.

Dr. Watson examined claimant again on November 12, 1996, and noted that claimant had "some numbness and tingling into the hand and fingers and pain radiating to the elbow." Approximately one month later, Dr. Watson released claimant to light work duty.

Claimant returned to work on December 20, 1996, and reinjured his right arm. Dr. Meyer's notes of December 20 stated that claimant was experiencing tingling in his right arm and that claimant had a "tender cubital tunnel." Claimant visited Dr. Watson on January 7, 1997. Dr. Watson's notes from that date indicated that claimant "felt a snap in his shoulder with pain, numbness, and tingling in his right arm" when he pulled on something with his right arm. According to Dr. Watson, claimant reinjured his right brachial plexus on December 20.

Claimant was subsequently referred to Dr. Gordon Allen. Dr. Allen recommended another EMG, which Dr. Trudeau performed on March 17, 1997. The EMG showed improvement in claimant's brachial plexopathy. The EMG also revealed mild cubital tunnel syndrome, as claimant exhibited a "positive Tinel's sign over the ulnar aspect at the

right elbow." Cubital tunnel syndrome is caused by a swelling or impingement of the ulnar nerve and results in irritation at the elbow. Dr. Trudeau recommended conservative treatment for claimant's cubital tunnel syndrome.

On March 21, 1997, Dr. Watson performed surgery on claimant's right shoulder. He found no tears in claimant's rotator cuff.

On June 3, 1997, Dr. Meyer performed a cubital tunnel release, which in his opinion was necessary to relieve pressure on claimant's ulnar nerve. Dr. Meyer testified that claimant's cubital tunnel syndrome was causally related to his July 1996 accident. Dr. Meyer also testified that Dr. Watson, in a letter to Dr. Meyer dated July 31, 1997, wrote that his (Dr. Watson's) medical records would support a finding of a causal relationship between claimant's July 1996 accident and his ulnar nerve problem. That letter cannot be found in the record.

Respondent elicited evidence that claimant had filed several workers' compensation claims prior to the instant one. For instance, in August 1993, claimant fell from a support device and suffered injuries to his legs, hands, head, and neck. He subsequently underwent three operations for carpal tunnel syndrome in his right hand. On cross-examination, Dr. Meyer admitted that, following claimant's August 1993 accident, Dr. Meyer opined that claimant would no longer be able to work as an ironworker. Indeed, Dr. Meyer made such representations to claimant and to the Social Security Administration in an October 1994 letter.

Respondent also introduced an April 10, 1996, letter authored by Dr. Meyer. Dr. Meyer wrote the following regarding his April 2 examination of claimant: "[Claimant] has some numbness in his right hand with a positive Tinel sign on his right. This has subsided somewhat so he should be able to handle weights up to approximately 25 pounds with a maximum of 50 pounds fairly easily at any one time on limited occasions and less than that with no trouble at all."

Respondent also introduced the testimony of Dr. David Fletcher. Dr. Fletcher testified as follows: that claimant's July 1996 accident was not one that could have caused cubital tunnel syndrome; that neither the July 2, 1996, accident nor the December 20, 1996, incident caused cubital tunnel syndrome; and that the cubital tunnel surgery that Dr. Meyer performed in June 1997 was unnecessary and unreasonable.

The arbitrator awarded claimant 51⁶/₇ weeks of temporary total disability benefits but found that claimant's cubital tunnel condition, "if any," was not causally related to claimant's July 1996 accident or to his day of work in December 1996. In finding a lack of causation,

the arbitrator relied in part on Dr. Fletcher's testimony. Claimant appealed, and the Commission affirmed and adopted the decision of the arbitrator. However, the Commission struck Dr. Fletcher's "non[ ]causal connection opinion based upon [section] 12 of the Act [(820 ILCS 305/12 (West 1996))]," since Dr. Fletcher did not timely disclose his causation opinion.

Claimant again appealed, and the circuit court confirmed. Claimant now brings this appeal, maintaining that the Commission's decision as to causal connection was against the manifest weight of the evidence.

■ In a workers' compensation case, the claimant has the burden of establishing, by a preponderance of the evidence, some causal relation between his employment and his injury. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 63, 541 N.E.2d 665, 669 (1989). The determination as to causal connection falls uniquely within the province of the Commission and will not be overturned unless it is contrary to the weight of the evidence. *Boatman v. Industrial Comm'n*, 256 Ill. App. 3d 1070, 1071-72, 628 N.E.2d 829, 830 (1993).

■ For a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be apparent. Stated differently, a decision is contrary to the manifest weight of the evidence only when the court determines that no rational trier of fact could have agreed with the Commission's decision. *Dolce v. Industrial Comm'n*, 286 Ill. App. 3d 117, 120, 675 N.E.2d 175, 178 (1996). It is solely within the Commission's province to judge the credibility of witnesses, determine what weight to give testimony, and resolve conflicting evidence, including medical testimony. *McRae v. Industrial Comm'n*, 285 Ill. App. 3d 448, 451, 674 N.E.2d 512, 514 (1996).

Claimant asserts that the Commission's decision was manifestly erroneous for two reasons: first, he maintains that the Commission erred in discounting the "unrebutted medical testimony" of Dr. Meyer and Dr. Watson; and second, he claims that the Commission (in adopting the decision of the arbitrator) failed to take into consideration certain evidence which suggested a causal connection existed.

With regard to his first argument, claimant maintains that both Dr. Meyer and Dr. Watson found a causal connection between claimant's cubital tunnel syndrome and his July 1996 accident. Dr. Fletcher, on the other hand, testified as to a lack of causal connection. However, as claimant correctly points out, the Commission struck the causal-connection portion of Dr. Fletcher's testimony. Claimant thus contends that, since the only remaining medical opinions on the causation issue were those of Dr. Meyer and Dr. Watson, the Commission was forced to accept their opinions as true. Citing *Dean v. Industrial*

*Comm'n*, 143 Ill. App. 3d 339, 493 N.E.2d 16 (1986), claimant contends that the Commission erred as a matter of law in rejecting the sole medical testimony on the causation issue. See *Dean*, 143 Ill. App. 3d at 345-46, 493 N.E.2d at 20 (where there was only one medical opinion on issue of causation, causation issue became one of law and Commission erred in discounting the unrebutted opinion).

■ We are unpersuaded by this argument, as we have criticized and rejected *Dean* in two recent cases. See *Kraft General Foods v. Industrial Comm'n*, 287 Ill. App. 3d 526, 532, 678 N.E.2d 1250, 1253-54 (1997); *Sorenson v. Industrial Comm'n*, 281 Ill. App. 3d 373, 383-84, 666 N.E.2d 713, 720 (1996). In both of those cases, we held that the Commission in its discretion is not bound by unrebutted medical testimony. *Kraft*, 287 Ill. App. 3d at 532, 678 N.E.2d at 1253-54; *Sorenson*, 281 Ill. App. 3d at 384, 666 N.E.2d at 720. As we stated in *Kraft*:

> "In [*Sorenson*], we directly addressed this argument and rejected it, disagreeing with statements made by the majority in *Dean* to the contrary and agreeing with the dissent. In particular, we found persuasive the statement that if the Commission was bound by the sole medical testimony, it ' "would be forced to find that the earth is flat if such testimony were presented." ' *Sorenson*, 281 Ill. App. 3d at 384[, 666 N.E.2d at 720], quoting *Dean*, 143 Ill. App. 3d at 346[, 493 N.E.2d at 21] (Webber, P.J., dissenting). Again, we reiterate that the sole medical opinion may not be arbitrarily rejected. However, it is not binding on the Commission simply by virtue of the fact it is the sole medical opinion." *Kraft*, 287 Ill. App. 3d at 532, 678 N.E.2d at 1253-54.

■ The Commission implicitly found that Dr. Meyer was not a credible witness, and there was evidence to support that finding. First, Dr. Meyer testified that prior to his July 1996 injury claimant was asymptomatic in his right arm; yet Dr. Meyer's April 10, 1996, letter indicated that claimant had recently complained of a sore right shoulder and of numbness and tingling in his right hand. Second, Dr. Meyer testified on direct examination that claimant was fully capable of performing ironwork in July 1996; however, not only had Dr. Meyer in April 1996 placed claimant on lifting restrictions, Dr. Meyer had also opined in October 1994 that claimant would never be able to perform the work of an ironworker. Finally, Dr. Trudeau in March 1997 called for conservative treatment of claimant's "mild" case of cubital tunnel syndrome; nonetheless, in June 1997 Dr. Meyer went ahead and operated on claimant's elbow—an operation that the Commission deemed unnecessary and unreasonable. Based on both the discrepancies in Dr. Meyer's testimony and the circumstances surrounding the June 1997 operation, the Commission was entitled to disbelieve Dr. Meyer.

The Commission likewise did not have to accept as true Dr. Meyer's statement that Dr. Watson found a causal connection. First, Dr. Watson did not testify at the hearing or by deposition. Second, nowhere in his notes did Dr. Watson opine that a causal connection existed between the July 1996 accident and the cubital tunnel syndrome. In fact, Dr. Watson never even diagnosed cubital tunnel syndrome. The only evidence in the record of a possible causal connection opinion attributable to Dr. Watson is a statement made by Dr. Meyer. Dr. Meyer testified that Dr. Watson informed him in a July 1997 letter that his (Dr. Watson's) medical records would support a finding of causal connection. However, that letter was not admitted into evidence and is not found in the record. Thus, since the evidence suggests that Dr. Meyer was not a credible witness, then certainly the Commission acted within its discretion in assigning little if any weight to a causal "opinion" of Dr. Watson.

Claimant also contends that the Commission's decision was against the manifest weight of the evidence in that the Commission ignored evidence that tended to prove a causal connection. Claimant points to several statements made in medical records that allegedly show that claimant had elbow problems after his July 1996 accident. In particular, claimant stresses: (1) the emergency room records that stated that claimant could not raise his right arm; (2) Dr. Meyer's July 8, 1996, notation that claimant had a "painful arm and shoulder and tingling of digits 1, 2 & 3"; (3) Dr. Watson's July 30, 1996, note that claimant had occasional numbness in his right arm and was "unable to elevate his right arm"; (4) Dr. Watson's September 17, 1996, notation that "pain will often shoot down [claimant's] arm into the forearm region"; (5) Dr. Trudeau's September 18, 1996, report that claimant was unable to elevate his right arm; and (6) Dr. Watson's November 12, 1996, note that claimant experienced "numbness and tingling into the hands and fingers and pain radiating into the elbow."

Our review is limited to whether sufficient evidence existed to support the Commission's decision. See *Saunders v. Industrial Comm'n*, 301 Ill. App. 3d 643, 649, 705 N.E.2d 103, 107 (1998). The Commission found that even if claimant had cubital tunnel syndrome, the syndrome was not caused by his work-related accidents. The Commission based its decision on the following: (1) that claimant made no significant complaints of right elbow pain; (2) that the emergency room records contained no reference to elbow trauma; (3) that, except for one reference made by Dr. Meyer on December 20, 1996, there was no mention of cubital tunnel syndrome from July 1996 until March 1997, when Dr. Trudeau noted a mild case of cubital tunnel; and (4) that Dr. Trudeau's September 1996 EMG and nerve conduction study showed no evidence of an ulnar nerve injury.

We find that there was sufficient evidence to support the Commission's decision. First, although claimant may have complained of elbow pain to Dr. Watson on November 12, 1996, that was the only elbow complaint he made between July 2, 1996, and December 19, 1996. His single complaint hardly established that he had cubital tunnel syndrome, let alone that his cubital tunnel syndrome was caused by the July 1996 accident. Moreover, despite examining claimant on numerous occasions, Dr. Watson never found an impingement of claimant's right ulnar nerve. Second, the Commission was correct in finding that the emergency records lacked any reference to right elbow pain; in fact, the records referred only to a right shoulder injury. Third, none of the doctors affirmatively diagnosed cubital tunnel syndrome until Dr. Trudeau performed the second EMG in March 1997, over seven months after claimant's July 1996 accident. Dr. Watson, whose medical notes consistently referenced right shoulder problems, diagnosed a brachial plexus injury. The Commission certainly could have found that claimant's shoulder problems resulted in claimant's inability to lift his arm. Furthermore, as Dr. Watson noted on September 17, 1996, the pain which shot down claimant's arm originated in claimant's shoulder or neck, not in his elbow. Also noteworthy is that claimant had had three carpal tunnel surgeries on his right hand prior to his July 1996 injury. Those operations could have accounted for the tingling in his hands.

Fourth, the Commission was correct in stating that Dr. Trudeau's September 1996 EMG did not reveal an injury to claimant's ulnar nerve. Claimant nonetheless challenges the reliability of that EMG. In particular, claimant emphasizes that Dr. Fletcher testified that Dr. Trudeau did not physically examine claimant's right elbow during that test. However, as respondent replies, Dr. Fletcher also testified that Dr. Trudeau electronically tested claimant's right ulnar nerve during the September 1996 EMG but did not report any nerve impingement.

Claimant presents no specific argument that his December 20, 1996, work accident caused his cubital tunnel syndrome. To the extent that he does, we emphasize that Dr. Watson in January 1997 wrote only that claimant's December 1996 injury resulted in a reinjury to the brachial plexus.

Based on the foregoing, we hold that the Commission finding that claimant's cubital tunnel syndrome was not causally related to either his July or December 1996 accident was not against the manifest weight of the evidence.

We therefore affirm the order of the circuit court.

Affirmed.

McCULLOUGH, P.J., and RAKOWSKI and RARICK, JJ., concur.

JUSTICE HOLDRIDGE, dissenting:

I respectfully dissent. The claimant presented medical opinion testimony establishing a causal connection between his cubital tunnel syndrome and his July 1996 accident. The employer's only medical opinion as to causation was stricken, thus leaving the claimant's medical opinion testimony unrebutted.

Here, we are being asked to revisit the question of the role unrebutted medical opinion evidence plays in the question of causation. As the claimant points out, under the analysis of the court in *Dean*, 143 Ill. App. 3d at 345, 493 N.E.2d at 20, unrebutted medical testimony as to causation would have been binding upon the Commission as a matter of law. However, as the majority notes (308 Ill. App. 3d at 1042), the *Dean* court's rationale for holding the Commission bound has been recently rejected by this court. *Kraft*, 287 Ill. App. 3d at 532, 678 N.E.2d at 1253-54; *Sorenson*, 281 Ill. App. 3d at 383-84, 666 N.E.2d at 720. Unlike *Dean*, which held that unrebutted medical testimony cannot be rejected by the Commission, the state of the law now holds that such unrebutted testimony cannot be *arbitrarily* rejected. *Kraft*, 287 Ill. App. 3d at 532, 678 N.E.2d at 1253-54.

The majority quotes Justice Webber's dissent in *Dean* as the rationale for this change, which noted that if the Commission were bound by the sole medical testimony it "would be forced to find that the earth is flat if such testimony were presented" (*Dean*, 143 Ill. App. 3d at 346, 493 N.E.2d at 21 (Webber, P.J., dissenting)). 308 Ill. App. 3d at 1042. While the concern that the Commission would be hit with "flat earth" testimony is not completely out of the realm of possibility, I am now convinced that the cure is worse than living with the remote possibilities that were present under the *Dean* analysis. Indeed, under the *Dean* formula, the appellate court, with its power of *de novo* review, would have been able to rectify any "flat earth" findings.

It would appear to me that by holding that the Commission is free to reject the only evidence before it as to causation, so long as that rejection is not *arbitrary*, we have lowered the standard of review on this crucial matter to one of an abuse of discretion. See *Kellett v. Roberts*, 281 Ill. App. 3d 461, 466, 667 N.E.2d 558, 562 (1996) (a decision is an abuse of discretion when it is arbitrary or exceeds the bounds of reason). In my opinion, such a minimal level of review to be

exercised by this court could lead to an erosion of the overall uniformity of precedent in the field of workers' compensation law.

I would also note my opinion that abandoning the *Dean* analysis may lead to needless increased litigation. Under *Dean*, all parties knew that in order to litigate the issue of causation, it would at least be necessary to present competing expert testimony on the issue. Some might argue that this requirement was a low hurdle over which *almost* every claimant and employer could jump. Nonetheless, without the requirement of competing medical evidence, a party might be more inclined to wade into battle in hopes that the Commission might reject the other party's unrebutted medical evidence, albeit not in an arbitrary manner. I make this observation knowing that in the instant case the employer attempted to present competing evidence, but it was rejected on a foundational basis. Still, I believe my point remains valid.

In short, I would accept the claimant's invitation to return to the bright-line test concerning expert opinion testimony previously articulated in *Dean*, *i.e.*, if a party is unable to at least present competing expert medical evidence as to causation, it should not have *any* opportunity to prevail on that issue. A return to that standard would serve claimants, employers, and the Commission itself better than the current system.

Based upon the foregoing, I would find that the Commission erred in finding that claimant failed to establish a causal connection between his cubital tunnel syndrome and his July 1996 accident. I would reverse the Commission and remand for an appropriate award of benefits.