**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (5th) 190117WC-U

FILED: February 20, 2020

NO. 5-19-0117WC

IN THE APPELLATE COURT

OF ILLINOIS

FIFTH DISTRICT

WORKERS' COMPENSATION COMMISSION DIVISION

| | | |
|---|---|---|
| CRAIG KAMP, | ) | Appeal from |
| Appellant, | ) | Circuit Court of |
| | ) | Madison County |
| v. | ) | No. 18MR160 |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al*. (Gateway Packaging Co., | ) | |
| Appellee). | ) | Honorable |
| | ) | David W. Dugan, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hoffman, Hudson, and Barberis concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The Commission's finding that claimant failed to prove that his injury arose out of his employment was not against the manifest weight of the evidence and it committed no error in denying claimant compensation under the Act.

¶ 2     On September 2, 2016, claimant, Craig Kamp, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (820 ILCS 305/1 to 30 (West 2014)), seeking benefits from appellee, his employer, Gateway Packaging Co. (Gateway). Claimant alleged he sustained a work-related injury to his back on June 26, 2016, when he was carrying a

100-pound sleeve from a printing press up a set of stairs. He felt pain in his back, but he believed he had just "tweaked" a muscle. He continued his shift. He was not scheduled to work for the next two days so, during that time off, he hoped his back pain would relieve itself with limited activity at home. On the second day, he prepared to shower when he felt back pain again as he bent over to remove his shorts. He continued into the shower but was unable to get out due to severe pain. He required assistance to walk. Claimant told his supervisor and his initial treatment providers only about the shower incident, not the work-related incident.

¶ 3      Following a hearing, the arbitrator found claimant had failed to prove he sustained an accident that arose out of and in the course of his employment and denied him all benefits under the Act. The arbitrator awarded the employer a credit in the amount of $7997 for non-occupational indemnity disability benefits. On review, the Illinois Workers' Compensation Commission (Commission) adopted the arbitrator's decision in full. On judicial review, the circuit court of Madison County confirmed the Commission. We affirm.

¶ 4                          I. BACKGROUND

¶ 5      On March 29, 2017, and May 8, 2017, the arbitrator heard evidence on claimant's petition. Claimant testified he had been employed at Gateway for nine years. On Sunday, June 26, 2016, claimant was working in the flexograph printing department as the "first pressman," where he had been assigned for the past year and a half. His job was to "get the press up and running as quickly and efficient[ly] as [he could] and keep it running and have fast changeovers and make readies with the least amount of waste." He routinely had to lift objects. On this particular day, toward the end of his shift, he was changing the press from an eight- or nine-color job to a two-color job. He was carrying "a sleeve," weighing close to 100 pounds, up to the top deck by going up a flight of stairs. He held the sleeve over his shoulder and held on to the handrail with the

opposite hand. He said as he "was climbing up the steps[,] he felt something in [his] back and [he] just thought [he] tweaked a muscle or something." He said he was not "too concerned about it." He described the sleeve as 5 feet long and 35 inches around. When he got to the top of the stairs, he "slung if off" his shoulder into his arms. He reached forward to "slide it on the mandrel [ ] when [he] felt the pain." He continued to work the remainder of his shift. On the way home, he told Lisa, his then girlfriend who also worked there, about his pain. (Lisa was not called as a witness.) Claimant said he was scheduled off the next two days. On Monday, the day after the accident, he felt "a little pain in [his] back but [he] just thought it was a tweaked muscle."

¶ 6        Claimant said on Tuesday, two days after the incident at work, he, Lisa, and her daughters "went for a little car ride." On the way home, they got a flat tire and started to walk home when a friend saw them. Claimant said his friend "changed [his] tire with [him]." That evening, when claimant was preparing to take a shower, he bent over to remove his shorts and "felt something in [his] back again." Despite some pain, he continued with his shower. When he finished, he felt severe pain and was unable to step out of the shower. He said he could not walk or dress himself. Lisa helped him to a bed.

¶ 7        Claimant said he called his supervisor, Ray Byrd, on Wednesday morning and advised his "back was really sore." Byrd agreed to give claimant a paid vacation day. According to an exhibit entered into evidence, in a July 8, 2016, e-mail, Byrd documented his recollection of his conversation with claimant. Byrd noted that claimant texted him at 5:30 a.m. on Wednesday, asking Byrd to call him. When Byrd called him, claimant told Byrd that when he got out of the shower, he bent over to get dressed and a pain shot through his back down through his leg. Byrd said claimant told him the pain was so bad it knocked him to the floor and Lisa had to help him up. Claimant told Byrd he would let him know how he was on Thursday. Byrd also noted he spoke

with claimant on July 8, 2016. In the conversation, claimant asked Byrd to "fill out a[n] accident report for him hurting his back lifting bridges, plate sleeves and aniloxes."

¶ 8        Claimant said he was aware of the company's policy about filing an accident report, but he did not do so because he "just thought [he] tweaked a muscle or something and it would be fine the next day." He said he spoke with Barb Henry (in the human resources department) and asked her to send an accident report home with Lisa but she did not do so. Claimant said he also completed short-term disability and "FMLA" paperwork as well. He did not inquire about workers' compensation benefits.

¶ 9        Claimant first sought treatment on July 1, 2016, with his primary care physician Dr. David Peter. Dr. Peter wrote in his notes that claimant's "pain first began when he was leaning forward to get into the shower" and he "denies any recent trauma or other difficulty." Claimant explained Dr. Peter's note as follows:

> "Because for me trauma means I didn't, you know, have an accident and that—where—it was—I mean, I don't know what I'm trying to say. I didn't realize I had anything going on, you know. I know that Friday when I went to the hospital, before that I went and seen my primary doctor. It was the first time I could get into see him and he just gave me pain medicine and sent me on my way, and I'll never go back to him again, but that evening it got so bad I started losing feeling in my legs. I remember it like it was yesterday. I thought I was paralyzed."

Being dissatisfied with his visit with Dr. Peter, claimant went to the emergency room at Barnes-Jewish St. Peters Hospital on July 1, 2016, because he wanted "to know what is wrong."

¶ 10        Dr. Peter referred claimant to Dr. Piper, an orthopedist, who, in turn, recommended physical therapy. Dr. Piper ordered two injections which, according to claimant, somewhat

- 4 -

alleviated the pain. Claimant said he was currently being treated by Dr. Matthew Gornet, a referral by Dr. Piper, after Dr. Piper discovered this was a workers' compensation case. Claimant said he had received "some money through short-term disability."

¶ 11 On cross-examination, claimant testified he laid in bed and rode in the car during the two days following the incident at work. He said he felt his condition got worse when he showered on Tuesday. When he saw Dr. Gornet, he explained he had an accident on June 26, 2016, but his back went completely out on June 28, 2016. He explained he had treated with Dr. Piper from July 5, 2016, through September 13, 2016. Dr. Piper refused further treatment after September 13, 2016, when he was advised this was a workers' compensation case.

¶ 12 The employer's counsel questioned claimant about his answers on the medical providers' questionnaires. For example, on July 19, 2016, claimant completed a questionnaire for Dr. Piper's office and indicated the injury was not work related. The physical therapist, Charles McDonald, noted claimant denied any prior history of back injuries and noted only that claimant reported the onset of low back pain when he removed his shorts.

¶ 13 On redirect, claimant said he had never had a magnetic resonance imaging (MRI) scan or a computerized tomography (CT) scan on his back, never been prescribed pain medication for back pain, and had never been involved in a significant automobile accident prior to the work incident. Claimant rested.

¶ 14 The employer called Barbara Henry, the human resource director at Gateway since May 2016. On July 5, 2016, claimant met with Henry and retrieved "paperwork" for short-term disability and medical leave. He did not request any workers' compensation paperwork or mention any work-related injury. Claimant told Henry the "accident" occurred when he was preparing to take a shower. Henry said she learned the accident was allegedly work related based on a July 8,

2016, email from supervisor Ray Byrd. Henry said she gave Lisa the workers' compensation paperwork and told her to have claimant call Henry before he completed the documents so she could go through it with him. Henry said she did not hear from claimant nor did she receive the paperwork.

¶ 15      On cross-examination, Henry acknowledged that on July 28, 2016, she had sent an email to "a bunch of people" explaining that she had gotten disability paperwork from claimant in which he had indicated he had injured himself at work on June 26, 2016.

¶ 16      The employer then called Bob Tiepelman, the production manager, as a witness. Tiepelman said he first learned of claimant's injury when Byrd called him. Tiepelman pulled two videos of claimant walking to the parking lot after his alleged injury on June 26, 2016. Tiepelman testified that, in his opinion, the video did not provide any evidence of an apparent injury. He said claimant did not follow the proper procedures regarding immediately reporting any work accident.

¶ 17      At the close of the employer's case, claimant introduced his medical records, which are not in dispute. The records reveal claimant first sought treatment with Dr. Peter on July 1, 2016, and denied any trauma. He was diagnosed with low back pain and was prescribed medication. Later that day, claimant went to the Barnes-Jewish St. Peters Hospital emergency room complaining of lower back pain which radiated down his legs. The record from the emergency room stated claimant presented "with a complaint of low back pain with radiation to his left lower extremity. The pain has been present for the past four to five days and worsening over the past day." According to the hospital notes, claimant stated the "pain first began when he was leaning forward to getting to the shower. He denies any recent trauma or other difficulty." A CT scan of the lumbar spine revealed a broad-based disc bulge at L4-L5 and mild multilevel degenerative disc disease. Claimant was diagnosed with a herniated disc. He was given a

prescription, was discharged, and instructed to follow up with Dr. Piper.

¶ 18        Dr. Piper's notes, which were also introduced, revealed that claimant reported that his back pain began when he was "[g]etting in the shower." An MRI scan confirmed the results of the CT scan, which demonstrated the bulging disc at L4-L5. Claimant was referred to physical therapy.

¶ 19        Claimant participated in physical therapy at Excel Sports and Physical Therapy. His intake paperwork revealed that he denied the injury was work related and reported that he "was simply removing a pair of shorts when the onset of lower back pain occurred."

¶ 20        In October 2016, claimant sought treatment from Dr. Gornet. Claimant reported to Dr. Gornet that "his problem began on [June 26, 2016]" when he was carrying the sleeve at work and felt pain in his back. Although he said "this [pain] was different," he often experienced pains in his arms and back. He also reported the onset of "sudden severe pain" two days later when he bent over to remove his shorts before showering.

¶ 21        In January 2017, the employer arranged an independent medical examination (IME) with Dr. Daniel Kitchens. Claimant reported to Dr. Kitchens the pain he experienced at work on June 26, 2016, and the subsequent shower incident on June 28, 2016. After Dr. Kitchens' review of the pertinent medical records and physical examination of claimant, he concurred that claimant suffered a herniated disc at L4-L5. He found claimant's medical history "inconsistent," noting claimant first mentioned a work-related accident to Dr. Gornet. Dr. Kitchens said he was "unable to give an opinion as to the timing of the disc herniation as it relate[d] to his work activity." Because claimant's report of a work-related injury to Dr. Gornet contradicted claimant's other medical records, Dr. Kitchens found "no medical record evidence that would support that [claimant's] lumbar disc herniation occurred at work on June 26, 2016." In Dr. Kitchens's opinion,

within a reasonable degree of medical certainty, claimant's

> "disc herniated spontaneously without any traumatic event. Bending over and removing shorts is not a supraphysiologic force and is a common maneuver that people do on a routine basis and is not, in itself, enough force to cause a disc to herniate[ ]. Symptomatically, however, that is when the disc herniat[ed]. It is [his] opinion, within a reasonable degree of medical certainty, that the factors responsible for the herniation are of a degenerative nature and are affected by [claimant's] chronic tobacco abuse."

¶ 22    After his IME, claimant returned to Dr. Gornet in February 2017. Dr. Gornet reported that he agreed with Dr. Kitchens that the "event of getting out of the shower was not a traumatic event." However, according to Dr. Gornet, "[t]he plausible explanation is that the significant lifting activity that he performed at work caused a disc injury that progressed over the next several days."

¶ 23    After considering the evidence presented, the arbitrator determined that claimant had failed to prove he sustained an accidental injury on June 26, 2016, that arose out of and in the course of his employment. She found claimant's testimony that he injured his back at work was "undermined by the medical records in this matter and that the contemporaneous histories in the medical records, where available, contradict [claimant]'s testimony." The arbitrator denied claimant's claim.

¶ 24    On June 8, 2018, the Commission affirmed and adopted the arbitrator's decision in full. On March 11, 2019, the circuit court of Madison County confirmed the Commission.

¶ 25    This appeal followed.

¶ 26                                II. ANALYSIS

¶ 27        On appeal, claimant argues that the Commission's finding that claimant failed to sufficiently prove he suffered an injury arising out of and in the course of his employment was against the manifest weight of the evidence.

¶ 28        We note as a preliminary matter that the employer argues that claimant's statement of facts includes argument and comment in violation of Illinois Supreme Court Rule 341(h)(6) (eff. May 25, 2018). While we may strike a statement of facts or dismiss an appeal based upon such violations, we decline to do so here, as the violations do not hinder our review. See *O'Gorman v. F.H. Paschen, S.N. Nielsen, Inc.*, 2015 IL App (1st) 133472, ¶ 80. However, we should disregard the noncompliant portions of claimant's statement of facts. See *id.*

¶ 29        An employee's injury is compensable under the Act only if it "aris[es] out of" and "in the course of" his employment. 820 ILCS 305/2 (West 2014). Both elements must be present for the claimant's injuries to be compensable. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 483 (1989). "In the course of" refers to the time, place, and circumstances under which the accident occurred. *Mlynarczyk v. Illinois Workers' Compensation Comm'n*, 2013 IL App (3d) 120411WC, ¶ 13.

¶ 30        That is, to obtain compensation under the Act, a claimant must prove that some act or phase of his employment was a causative factor in his ensuing injuries. *Land & Lakes Co. v. Industrial Comm'n*, 359 Ill. App. 3d 582, 592 (2005). An accidental injury need not be the sole or principal causative factor, as long as it was a causative factor in the resulting condition of ill-being. *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003). In resolving disputed issues of fact, including issues related to causation, it is the Commission's province to assess the credibility of witnesses, draw reasonable inferences from the evidence, determine what weight to give

testimony, and resolve conflicts in the evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009); *Fickas v. Industrial Comm'n*, 308 Ill. App. 3d 1037, 1041 (1999). We will overturn the Commission's causation finding only when it is against the manifest weight of the evidence. A factual finding is against the manifest weight of the evidence if the opposite conclusion is "clearly apparent." *Swartz v. Industrial Comm'n*, 359 Ill. App. 3d 1083, 1086 (2005). The test is whether the evidence is sufficient to support the Commission's finding, not whether this court or any other tribunal might reach an opposite conclusion. *Pietrzak v. Industrial Comm'n*, 329 Ill. App. 3d 828, 833 (2002).

¶ 31    Although an employee's testimony about an alleged accident might be sufficient, standing alone, to justify an award of benefits under the Act, it is not enough where consideration of all facts and circumstances demonstrates that the manifest weight of the evidence is against it. *Caterpillar Tractor Co. v. Industrial Comm'n*, 83 Ill. 2d 213, 218 (1980). As we observe below, portions of claimant's testimony were contradicted by the record.

¶ 32    The parties do not dispute that claimant suffers from a herniated disc. The only disputed issue is what caused the herniation. Claimant asserts that he injured his back on June 26, 2016, while carrying a printing sleeve up a set of stairs during the course of his employment. He felt pain in his back as he slung the sleeve off his shoulder. Although he felt the pain, he believed he had only "tweaked" a muscle. Two days later, this injury, he claims, manifested itself in the form of severe debilitating pain while he was getting into or out of the shower at home.

¶ 33    Within days after the shower incident, claimant reported his injury to his employer, his primary physician (Dr. Peter), emergency room personnel, an orthopedic surgeon (Dr. Piper), and a physical therapist. Each time, claimant denied trauma and/or denied experiencing an accident or injury at work. His first report of a work-related injury to a medical provider was in October

2016 to Dr. Gornet.

¶ 34     Claimant argues that this case involves only two possibilities. Either claimant injured himself at work while carrying the heavy sleeve *or* he injured himself at home when he bent over to remove his shorts in preparation for a shower. Drs. Gornet and Kitchens agreed that claimant's herniated disc was *not* caused by bending over to remove clothing. Therefore, claimant argues, there remained only one other possibility. As Dr. Gornet found, "[t]he plausible explanation is that the significant lifting activity that [claimant] performed at work caused a disc injury that progressed over the next several days."

¶ 35     However, because claimant failed to conclusively prove that he suffered an injury at work, it is just as likely that there exists a third possibility—that he suffered an injury sometime between leaving work on June 26, 2016, and taking a shower on June 28, 2016. The manifest weight of the evidence, *i.e.*, claimant's actions and his medical records, does not support his claim of a work-related injury.

¶ 36     As we stated previously, in resolving questions of fact, it is within the province of the Commission to assess the credibility of witnesses, resolve conflicts in the evidence, assign weight to be accorded the evidence, and draw reasonable inferences from the evidence. *Hosteny*, 397 Ill. App. 3d at 678-79. Applying the appropriate standard, we find the Commission's conclusion that claimant's current condition is not causally connected to a work-related accident was not against the manifest weight of the evidence.

¶ 37                              III. CONCLUSION

¶ 38     For the reasons stated, we affirm the circuit court's judgment, confirming the Commission's decision.

¶ 39     Affirmed.