FERMI NATIONAL ACCELERATOR LAB, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Joseph Prince, Appellee).

Second District (Industrial Commission Division)   No. 2—91—0356WC

Opinion filed January 15, 1992.—Rehearing denied March 2, 1992.

James F. Gorman, of Gifford, Detuno & Gifford, Ltd., and Thomas W. Gifford, of Roddy, Power, Leahy, Guill, Zima & Gifford, both of Chicago, for appellant.

Robert B. Williams, of Williams & Marcus, of Chicago, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Claimant suffered an injury to his right ankle when he twisted it after stepping off a stoop on respondent's premises. While recuperating nine days later, he fell at a shopping mall, causing additional injuries to his right knee and left thumb. The Industrial Commission (Commission) determined that both injuries constituted a single accident and awarded benefits. The circuit court confirmed the Commission's decision.

On appeal, respondent raises the following issues: (1) neither injury is compensable; (2) a shorter period of temporary disability should have been awarded; (3) some of claimant's medical problems are not causally related to his accident; (4) penalties were improperly imposed; (5) the Commission erred in remanding the case to the arbitrator to determine the amount of any credit which respondent might be due because of its overpayment of benefits to claimant; and (6) the arbitrator improperly refused to admit testimony from two of respondent's witnesses.

The underlying facts are substantially uncontroverted. Claimant filed separate applications for adjustment of claim for two injuries occurring on May 10 and May 19, 1989. Claimant holds a Ph.D. in toxicology and pathology and was employed by respondent as an environmental and occupational health and safety engineer at its 4,800-acre complex. Claimant's duties included recovering water and soil samples from a variety of locations within and without the laboratory facilities for further analysis.

On May 10, 1989, claimant and another employee, Mark Thomas, were in the central utility building on site waiting to recover a water sample. Due to a water treatment process which was in progress, Thomas decided to leave the building to smoke a cigarette. Claimant accompanied Thomas to get some fresh air. With respect to the accident, claimant testified:

> "I followed Mark out the door and Mark went left and I went to follow him and as I followed I stepped off this stoop and as I stepped off the stoop my foot felt something solid. I transferred my weight but as I transferred my weight the rocks under foot gave way and my foot rolled to the right."

Claimant severely twisted his right ankle and fell. He was removed to a hospital and, after an X ray, was given medication, had the ankle placed in a splint, and was provided crutches.

Claimant testified he had never used crutches before, was not given any instructions in their use, and did not remember if they were adjusted to his height before he left the hospital. Because he had never used crutches, claimant stated his movements and ability to walk were awkward. He relied upon a combination of hopping and jumping to get around.

Two days after the accident, claimant saw Dr. Lowry, who placed a cast on claimant's right foot and told him to return home and stay off his feet. Except for going to the bathroom, claimant remained bedridden. Nine days after the accident, claimant again saw Lowry on May 19, 1989. A new cast was placed on the right ankle which extended to claimant's knee. Lowry again sent him home and told him to rest the leg.

Claimant's wife drove him to and from the May 19 appointment with Lowry. On the way home, claimant had the urge to void urine and his wife stopped at a shopping mall for that purpose. The parties entered the mall through a Marshall Field store. Claimant was using his crutches.

The store entrance was carpeted but the floor inside the doorway was either linoleum or marble tile. Both the carpet and floor were wet due to the fact that it had rained earlier in the day. Claimant testified that as he was walking with his crutches, they slid out from under him. His left foot went forward and his right foot with the cast went backward. He then fell on his elbow and back injuring his right knee and left thumb. Claimant called Dr. Lowry from the mall. Lowry advised him to come in for treatment in several days. Claimant again visited Lowry on May 22, 1989, at which time Lowry placed claimant's left arm in a cast from his fingers to the elbow.

Following the May 19 office visit with Lowry, but prior to the subsequent accident, Lowry told claimant he should stay off work for four weeks or until approximately June 20, 1989. According to claimant, Lowry never told him he was able to return to sedentary work prior to his second fall.

Claimant received a letter dated May 31, 1989, from respondent's insurance carrier indicating sedentary work was available. Claimant immediately called both Dr. Lowry and Dr. Lang, medical director at the Fermi Lab, to explain that he had casts on both his leg and arm and could not walk. Dr. Lang, according to claimant, advised him on either June 2 or 3 that the letter had been sent prior to knowledge of the extent of claimant's injuries and that it was sent in error.

Claimant again saw Dr. Lowry late in June 1989. The casts were removed from claimant's arm and leg, and his leg was wrapped in an elastic bandage and an air splint. Claimant returned to Lowry on August 17 when Lowry prescribed extensive physical therapy. Although claimant acknowledged that his right ankle began to improve slowly, he testified that his knee, wrist, and thumb were still extremely painful and showed no improvement. At approximately this point in time, Lowry informed claimant that he could expect to have pain for at least 8 to 10 months during recovery.

Claimant then sought out Dr. Sawchyn. Claimant contended that he learned of Sawchyn's name through inquiries at the University of Illinois Medical School and Hospital where he had been a student. Claimant saw Sawchyn on September 6, 1989.

Claimant testified that his ankle, knee, and wrist remain painful, he cannot walk properly, and has a problem negotiating stairs. Claimant also stated he attempted to solicit outside consulting work after his injuries but because this employment would have required travel and other physical activities, claimant did not find alternative work.

On cross-examination, claimant admitted that in July 1989 he and his wife went to the Caribbean for a vacation. He also stated he was able to perform sedentary work as of the date of the arbitration hearing, November 6, 1989. Finally, he acknowledged that during his last visit to Dr. Lowry, Lowry advised that he had only certified claimant to be off work until August 5, 1989.

On re-cross-examination, claimant testified that the trip he and his wife took was a 30th wedding anniversary vacation that had been scheduled since December 1988.

Dr. Lowry, a board-certified orthopedic specialist, testified he first saw claimant on May 12, 1989, for a severe sprain to claimant's right ankle. An X ray revealed no fractures, and claimant's ankle was

splinted and crutches were provided. Claimant's next visit was on May 19 when a short leg cast was applied to the right ankle and the use of crutches was continued. Prior to May 19, Lowry wrote to respondent indicating that in the intermediate to near future it was possible claimant could return to sedentary work if it required only sitting.

Lowry again saw claimant on May 22 following his subsequent fall. A cast was placed on claimant's right arm from his wrist to his elbow. At that time, Lowry did not believe claimant could perform any sedentary work because of his several injuries. On June 16, 1989, Lowry removed both casts and applied an air splint to claimant's right ankle. Claimant was told to continue using crutches and to put weight on the leg only to the extent possible. As of June 16, 1989, Lowry was of the opinion claimant was still not able to perform any type of work. On June 23, 1989, Lowry prescribed physical therapy and certified claimant to be off work through July 15.

On July 14, 1989, Lowry saw claimant and certified him to be off work through August 5. A tentative appointment for August 4 was cancelled because it conflicted with claimant's Caribbean vacation. It was reset to August 17, when, according to Lowry, he concluded claimant was capable of performing sedentary work even though claimant was walking with a severe and extremely noticeable limp. Lowry testified that as far as his records were concerned claimant had not been certified to be off work beyond August 5, 1989.

On cross-examination, Lowry was questioned about his May 12 letter to respondent indicating claimant might have been able to perform sedentary work. Lowry admitted that the suggestion in his letter that claimant might be able to work was conditioned upon claimant's ability to allow his ankle to hang down for four to six hours a day and there was nothing of which Lowry was aware which would indicate claimant was capable of performing this activity. Lowry also admitted that his office notes contain no reference to any injury or treatment of claimant's knee following June 16, 1989, despite claimant's testimony he was having continuing difficulties with his knee and thumb which he was allegedly relating to Lowry.

Jo Ann Baaske, respondent's payroll manager, testified to various amounts of workers' compensation and sick pay paid to claimant. She stated that due to an internal accounting error claimant was apparently overpaid by approximately $2,500.

Respondent then offered the testimony of two witnesses, David Cathey, a personnel supervisor with respondent, and Donald Musil, a private detective. Claimant objected to the testimony of these two

witnesses because neither was named as a potential witness in the response to claimant's petition under section 19(b—1) of the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 138.19(b—1)).

Respondent's attorney countered that he did not know about the relevance of Cathey's testimony until after the deadline for filing the section 19(b—1) form had expired and was not aware until approximately 3 p.m. the previous day that Musil had been hired by respondent's insurance company to secure information relevant to this case.

The arbitrator found counsel's explanations insufficient and refused to admit the testimony of the two witnesses.

Ruth Crist, respondent's assistant personnel manager, testified she was present at a prehearing conference several days prior to arbitration. While standing in a hallway, she observed claimant and a group of others emerge from a room. Claimant was walking in a perfectly normal manner, until he saw Crist, at which time he began limping.

The deposition of Robert Sawchyn, an orthopedic surgeon, was admitted. He examined claimant on September 6, 1989, for evaluation. According to Sawchyn, claimant's right ankle demonstrated anterior instability resulting in pain and tenderness on movement. Ligament instability was described as mild to moderate.

Claimant's right knee also showed significant tenderness, and, in Sawchyn's opinion, claimant suffered from a tear to the meniscus. Claimant's left hand was tender along the ulnar aspect of the MP joint of the thumb and also demonstrated ligament instability which affected claimant's ability to pinch and grasp objects.

Sawchyn believed that physical therapy and bracing would be beneficial to claimant's right ankle although surgical reconstruction of the ligaments might be required if the ankle did not respond. Because of the suspected meniscus tear, Sawchyn recommended arthroscopy for claimant's knee, although he admitted the X rays did not necessarily demonstrate a tear of the meniscus. Sawchyn also suggested ligament reconstruction might be appropriate for claimant's thumb.

Sawchyn again saw claimant on November 6, 1989. At that time, claimant's thumb and knee had not improved although claimant's ankle showed slight improvement. Sawchyn admitted claimant could perform some sedentary work if there was minimal ambulation required, and Sawchyn recommended a staged approach to claimant's recovery beginning with the knee. Sawchyn estimated that 8 to 12 weeks would be required to resolve the problems in claimant's knee and hand if reconstructive surgery was not required on claimant's ankle.

On cross-examination, Sawchyn indicated that his notes revealed that claimant first saw him on a referral from claimant's attorney. Sawchyn also admitted that, except for recommendations, he had not treated claimant for any of his medical problems. Sawchyn also stated that on claimant's first visit he was walking without crutches and was not wavering or using braces or other artificial devices such as a cane.

The arbitrator awarded benefits, finding two compensable injuries occurred. Temporary benefits for both falls covered the period from the date of the initial injury through August 15, 1989. The arbitrator also found respondent was entitled to certain credits against temporary total and potential permanent partial disability for excess payments made to claimant. Finally, the arbitrator denied claimant's request for penalties as well as a medical bill from Dr. Sawchyn because the examination was conducted for the purpose of giving testimony but not treatment.

The Commission modified the arbitrator's decision by determining that the combination of the May 10 and 19 falls constituted but one injury. The Commission also increased the amount of temporary total disability to reflect the entire period between the original accident and the date of arbitration. The Commission also awarded penalties and fees under sections 19(k) and (l) and section 16 of the Act (Ill. Rev. Stat. 1989, ch. 48, pars. 138.19(k), (l), 138.16) because it found respondent unreasonably and unilaterally terminated benefits on June 2, 1989, at a time when claimant was still under a doctor's care and respondent had been advised he was unable to return to work in any capacity. Finally, the Commission determined respondent was entitled to a potential credit for any excess payments under section 8(j) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.8(j)) and remanded the case to the arbitrator to determine what payments were made and the extent to which respondent was entitled to a credit, if any. The Commission concluded the evidence did not clearly establish that some of the payments qualified for section 8(j) credit.

On review, the circuit court confirmed the decision of the Commission, and respondent filed a timely notice of appeal.

Relying upon *Caterpillar Tractor Co. v. Industrial Comm'n* (1989), 129 Ill. 2d 52, 541 N.E.2d 665, respondent argues claimant failed to establish that his initial injury, stepping off a stoop, arose out of his employment. In *Caterpillar*, claimant stepped off a seven- to eight-inch curb onto a blacktop driveway in front of his place of employment. There was a slight cement slope between the curb and the driveway. Claimant's foot landed midway between the cement incline

and the blacktop, and he twisted his ankle. The driveway was part of the company premises and was used by both employees and the general public. No evidence was presented of holes, rocks, or other obstructions on the pavement. The supreme court concluded claimant did not establish his injury arose out of his employment upon the finding there was nothing in the record to indicate the curb was either defective or hazardous and, therefore, the condition of the premises did not contribute to the injury. The court also found claimant did not demonstrate he was exposed to a risk not common to the general public since curbs, and the risks inherent in traversing them, confront all members of the public.

Respondent contends this case is indistinguishable from *Caterpillar* because the evidence only shows that claimant stepped down from a "stoop," the area in which the accident occurred was not restricted to Fermi Lab employees, and there was no showing the stoop was defective. Respondent argues this court should discount or ignore claimant's testimony that when he stepped down, he stepped onto rocks under foot which gave way as he transferred his weight from one foot to another. Respondent suggests that this testimony at arbitration was the first time there was any hint that rocks were located underneath claimant's foot and, at most, the testimony proves nothing more than that claimant stepped to the surface of a gravel road.

No one at arbitration elicited any detailed testimony concerning the condition of the site of the injury. The record does not demonstrate whether the ground beneath the stoop was a gravel or paved or concrete surface. No one cross-examined claimant about his testimony or contradicted his statement that he stepped onto rocks. Even the height of the "stoop" is unknown.

■ We conclude a reasonable inference which the Commission was entitled to draw, in the absence of qualifying or illuminating evidence on this point, was that the rocks onto which claimant stepped were not natural to the surrounding area and could, therefore, be considered a "defect." Given this inference, questions of whether the risk was common to the general public and whether the general public had access to the area are irrelevant. Had respondent wished to clarify the circumstances under which the fall occurred, it could have easily done so by cross-examination. If anything, it is respondent who is engaging in speculation when it suggests that there were either no rocks at the point of injury or the rocks were simply part of a gravel road. Neither claim is supported by this record. The Commission's determination that claimant suffered an accidental injury arising out of his employment is not against the manifest weight of the evidence.

■ Respondent next contends claimant's second fall is not compensable because it was the result of claimant's negligent conduct in attempting to traverse a wet tile or stone floor on crutches. Respondent maintains this is an intervening incident which breaks the causal connection and severs respondent's liability for the subsequent additional injuries. We disagree.

But for the first injury, claimant would not have been using crutches. Claimant also testified he never used crutches before, did not know how to use them, was not instructed in their use, and was not sure he had ever been fitted for the crutches when they were first given him.

The Commission's determination that the subsequent accident was a natural consequence flowing from the original fall is not against the manifest weight of the evidence. As the supreme court stated in *International Harvester Co. v. Industrial Comm'n* (1970), 46 Ill. 2d 238, 245-47, 263 N.E.2d 49, 53-54:

> "Where the work injury itself causes a subsequent injury, however, the chain of causation is not broken. * * *
> * * *
> * * * [I]f a nonemployment-related factor is a contributing cause, with the compensable injury, in an ensuing injury or disability, it does not constitute an 'independent intervening cause' breaking the causal connection where it is not brought about by claimant's intentional or negligent misconduct."

Although there are no cases in Illinois which have considered the use of crutches, the weight of authority from other jurisdictions clearly suggests that the mere use of crutches is not negligence since maneuvering around on them is a natural and ordinary activity of a person who has sustained a leg injury. (See 1 A. Larson, Workers' Compensation Law §13.12(c), at 3—561 n.56 (1990), citing *Dickerson v. Essex County* (1956), 2 A.D.2d 516, 157 N.Y.S.2d 94.) In Larson's view, negligence breaking the causal connection takes the form of rashly undertaking a line of action with knowledge of the risk created by the weakened member. (1 A. Larson, Workers' Compensation Law §13.12(c), at 3—559 (1990).) Attempting to walk to a bathroom, even upon a wet floor, would hardly seem to qualify as a rash undertaking. (*Cf.* 1 T. Angerstein, Illinois Workmen's Compensation §495, at 344 (1952).) The Commission's determination that the two falls constituted a single compensable accident is not against the manifest weight of the evidence.

■ Respondent next contends that the Commission erred in extending the period of temporary total disability beyond that set by the

arbitrator, August 15, 1989. Respondent points to the testimony of Dr. Lowry that claimant was able to return to sedentary work as of August 17, 1989, and had only been certified by Lowry to be off work until August 5, 1989. In addition, claimant admitted he was capable of sedentary work, and there is no showing that his condition changed materially between the period of late August 1989 through the date of arbitration.

Although claimant suggests there is no evidence that Dr. Lowry ever released him to return to work, this claim is less than candid in the face of the fact that Dr. Lowry clearly stated he had not approved claimant to be off work beyond August 5, 1989, and claimant immediately discontinued his treatment with Lowry after August 17, 1989, the date Lowry advised claimant of this fact.

Claimant's reliance upon the testimony of Dr. Sawchyn is also not determinative. Although Sawchyn suggested claimant would need a substantial period of recuperation because of his various injuries, this observation was predicated upon the need for reconstructive surgery to one or more aspects of claimant's body. There was no testimony suggesting claimant had any present intention of undergoing future surgery. In addition, as of August 17, 1989, when claimant stopped seeing Dr. Lowry, the casts from both his arm and leg had been removed; and as of September 6, 1989, when claimant saw Dr. Sawchyn, he was able to walk without the use of artificial devices such as crutches, a cane, or a brace. For these reasons, we agree that the determination that claimant's temporary disability extended beyond the date set by the arbitrator is against the manifest weight of the evidence.

■ Respondent also contends that because Dr. Lowry's notes reveal no reference to a knee injury after June 16, 1989, any actual or suspected meniscus tear diagnosed by Dr. Sawchyn is not causally related to claimant's injury. This argument is without merit. There is no indication claimant suffered any injury to his knee other than that which occurred when he fell on the wet floor. That the knee problem may have initially resolved itself or the extent of the injury might have gone undiagnosed by Dr. Lowry does not entail that a subsequently diagnosed, more serious condition is not causally related to the initial injury. Respondent points to no other intervening incident, demonstrated of record, by which claimant might have reinjured the knee in some nonwork-related manner. The evidence supports the Commission's determination that claimant's current knee condition, whatever it might be, is causally related to his accident.

■ Respondent also argues the Commission should not have awarded penalties and attorney fees because the issue of claimant's second injury was, in the arbitrator's words, "keenly" contested. This argument is without merit. Respondent unilaterally stopped paying benefits on June 2, 1989. That decision was made in the face of written correspondence from Dr. Lowry to respondent which indicated claimant was unable to work. In the first letter, dated May 12, 1989, Lowry advised respondent that claimant was to be kept off work until May 18. In a second letter dated May 19, 1989, after claimant's office visit but prior to his second fall, Lowry wrote:

"The patient is presently scheduled to be off of work through June 20, 1989, however I did advise him that if he is able to let the ankle hang down for four to six hours at a time, he could consider returning to work to a sedentary position."

Claimant testified to receiving a letter dated May 31, 1989, from respondent indicating sedentary work was available. The undisputed testimony is that claimant immediately contacted Dr. Lowry and Dr. Lang, medical adviser to the Fermi Lab, to advise that he was unable to work at any job because of the additional injuries he suffered subsequent to the letter prepared by Dr. Lowry on May 19, 1989.

By further letter dated June 1, 1989, Dr. Lowry advised respondent that he had seen claimant on May 22, following his fall in the Marshall Field store. After describing claimant's condition, Dr. Lowry concluded:

"For this reason I would expect the patient to remain off of work for approximately four or five weeks after sustaining this sprain as he will be in a cast during that period of time. The patient is now presently in two casts, one on his left upper extremity, and one on his right lower extremity, which precludes his effective ambulation for any significant distance and precludes his driving."

It is, therefore, beyond dispute that respondent's unilateral termination of benefits occurred at a time when it was aware that claimant's treating physician had specifically indicated claimant was unable to perform work in any capacity because of his combined disabilities. Although respondent suggests that the inability to work was a result of the second, rather than the first injury, the plain terms of the doctor's June 1 letter require a different conclusion. The cast on claimant's leg prevented him from walking or driving. The cast was placed on his leg because of the ankle injury sustained in the original, not the subsequent, accident.

The intent of the penalty provisions of the Act is to "implement the Act's purpose to expedite the compensation of industrially injured workers and penalize an employer who unreasonably, or in bad faith, delays or withholds compensation due an employee." (*Avon Products, Inc. v. Industrial Comm'n* (1980), 82 Ill. 2d 297, 301, 412 N.E.2d 468, 470.) If an employer acts in reliance upon qualified medical opinion and disputes whether the employment was related to the alleged disability, penalties are not ordinarily imposed. (*O'Neal Brothers Construction Co. v. Industrial Comm'n* (1982), 93 Ill. 2d 30, 442 N.E.2d 895.) This is a factual question left to the Commission to resolve, and the Commission's determination will not be disturbed unless it is against the manifest weight of the evidence. (*Board of Education v. Industrial Comm'n* (1982), 93 Ill. 2d 20, 442 N.E.2d 883.) The burden of proof of the reasonableness of its conduct is on the employer. (*Board of Education v. Industrial Comm'n* (1982), 93 Ill. 2d 1, 442 N.E.2d 861.) Respondent's argument that it was relying on Dr. Lowry's May 19 letter which suggested the possibility of sedentary employment lacks credibility in the face of a follow-up letter dated June 1, 1989, subsequent to claimant's second fall, which clearly superseded any suggestion in the earlier letter that claimant was able to return to work in any capacity due to his several injuries. The Commission's determination that respondent's termination of benefits was unreasonable and vexatious is not against the manifest weight of the evidence, and its assessment of penalties and attorney fees is clearly appropriate. In view of our disposition reducing the amount of temporary total benefits, however, the case will be remanded to the Commission for recalculation of penalties and attorney fees under sections 19(k), (l), and 16 of the Act.

■ Respondent next argues the Commission erred in remanding the matter for a determination of the exact amount of credit which it was due under section 8(j)(2) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.8(j)(2)). Respondent contends the evidence at arbitration was clear and the Commission should have made this determination. The Commission, on the other hand, concluded the record was not clear and remanded to the arbitrator for the purpose of clarifying the issue. Respondent has not suggested how it has been injured by the Commission's action, especially when one considers that the Commission granted respondent the substantive potential relief to which it claimed it was entitled, a potential credit for overpayment of benefits.

■ Finally, respondent contends the arbitrator and Commission erred in not permitting it to present the evidence of two witnesses because their names had not been included in the employer's response

to claimant's section 19(b—1) petition for emergency hearing. That section provides, in part:

> "No document or other evidence not previously identified by either party with the petition or written response, or by any other means before the hearing, may be introduced into evidence without good cause. If, at the hearing, material information is discovered which was not previously disclosed, the Arbitrator may extend the time for closing proof on the motion of a party for a reasonable period of time which may be more than 30 days." Ill. Rev. Stat. 1989, ch. 48, par. 138.19(b—1).

Respondent contends that counsel's statements at arbitration to the effect that he had only recently discovered the existence or relevance of the potential testimony from claimant's supervisor and the private investigator constitute good cause. This argument is without merit. In the first instance, the arbitrator observed that there was a procedural means by which a petition or response could be amended and respondent had not availed itself of this opportunity. In addition, respondent did not request an extension, permitted under the Act, to enlarge the time for closing the proof. Finally, counsel made no offer of proof as to what the testimony of either witness might have been. Under the circumstances, the decision to refuse admission of the testimony of the two witnesses was not error.

For the foregoing reasons, the judgment is modified to the extent that the award for temporary total disability is reduced to the period between May 10, 1989, and August 15, 1989. The case is remanded to the Commission for recalculation of penalties and attorney fees in accordance with this opinion. In all other respects, the Commission's decision is affirmed.

Affirmed as modified and remanded.

RAKOWSKI, WOODWARD, STOUDER, and LEWIS, JJ., concur.