MOBIL OIL CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (David Haberkorn, Appellee).

Third District    No. 3—00—0931WC

Opinion filed February 1, 2002.

Bruce D. Crofts and Harry E. Kinzie, both of Nyhan, Pfister, Bambrick, Kinzie & Lowry, P.C., of Chicago, for appellant.

Mitchell W. Horwitz and Marc A. Perper, both of Horwitz, Horwitz & Associates, Ltd., of Chicago, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

Mobil Oil Corporation (Mobil) appeals from an order of the circuit court of Will County confirming a decision of the Industrial Commission (Commission) which awarded the claimant, David Haberkorn, benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1996)). For the reasons which follow, we affirm the circuit court's order in part and reverse it in part, vacate the Commission's decision in part, and remand this cause to the Commission.

The claimant filed an application for adjustment of claim seeking benefits under the Act for injuries he alleged that he received on July

17, 1997, while working for Mobil. Thereafter, he filed a petition seeking an emergency hearing pursuant to section 19(b—1) of the Act (820 ILCS 305/19(b—1) (West 1998)), alleging that Mobil refused to pay temporary total disability (TTD) benefits and also refused to pay for his medical expenses. The following facts are taken from the evidence presented at the arbitration hearing.

The claimant was a machinist in the employ of Mobil. In 1990, he developed low back and leg pain from causes unrelated to his employment and underwent a laminotomy at L5-S1. By 1992, his symptoms had subsided, and he returned to unrestricted work.

In January of 1997, the claimant again developed low back and leg pain and sought treatment with Dr. Karla R. Shively. Dr. Shively prescribed medication and a course of physical therapy. At the suggestion of Dr. Shively, the claimant underwent an MRI of the lumbar spine on February 14, 1997. The report of that test states that no evidence suggesting a recurrent herniated disc was detected but that contrast enhancement of the soft tissue density at L5-S1 was consistent with fibrotic changes and associated deformity of the lateral aspect of the thecal sac. On February 17, 1997, Dr. Shively referred the claimant to Dr. Keith Rezin, an orthopedic surgeon, for evaluation.

The claimant first saw Dr. Rezin on March 4, 1997. After examining the claimant and reviewing his medical records, Dr. Rezin was of the impression that the claimant had S1 radiculopathy. In a report of that visit, Dr. Rezin noted that, although the claimant's MRI of February 14 showed soft tissue findings at L5-S1 which the radiologist read as a scar, he was not convinced that the condition was all scar.

The claimant continued to treat with Dr. Rezin, who prescribed medication and a series of epidural injections. Dr. Rezin's notes of the claimant's visit on March 31, 1997, state that, although he reported some minimal posterior calf pain, the claimant was able to walk with a good gait. Dr. Rezin's impression on that date was that the claimant had a "[r]esolving S1 radiculopathy." Dr. Rezin released the claimant to return to light-duty work for two to three weeks and then to full, unrestricted duty. On April 21, 1997, the claimant returned to full-duty work.

From April 21, 1997, through July 17, 1997, the claimant sought no medical treatment but did exercise at Mobil's wellness center in an effort to stay in shape. On June 12, 1997, the claimant completed a health questionnaire, stating that he had no health concerns at that time.

On July 17, 1997, the claimant was engaged in a fire fighting training exercise at work. According to the claimant, he was holding a water hose under his arm and on his right hip. As he opened the nozzle,

the water pressure caused the hose to break loose. The claimant testified that, when the hose broke lose, he was jerked backwards and felt a pain or snap in his back. The claimant stated that, during his lunch break, he visited Mobil's wellness center but was unable to do his regular exercises due to the pain in his back.

Friday, July 18, 1997, was the claimant's scheduled day off. The claimant testified that he refrained from any physical activity that day due to soreness and stiffness in his back. He stated that, by July 19, 1997, he felt pain and numbness radiating down his left leg into his foot and toes.

The claimant went to work on Monday, July 21, 1997, and notified George Kraft, a supervisor, that he had been injured while operating a fire hose on July 17, 1997. He gave a similar account of his injury in an accident report he completed on July 25, 1997, and in the history that he gave to a plant nurse on that same day.

On July 21, 1997, the claimant went to Dr. Rezin's office, where he was examined by Dr. Stephen H. Treacy. Dr. Treacy's note of that visit states that the claimant informed him that he hurt his back at work when he turned on a fire hose and that the pain was getting worse. Dr. Treacy examined the claimant and recorded, *inter alia*, that he demonstrated no paraspinal spasm, had significant decrease on forward flexation secondary to pain, and experienced pain when attempting straight raises with either leg. Dr. Treacy's impression was that the claimant had a "[r]ecurrence of symptoms." He prescribed physical therapy and pain medication.

Dr. Treacy next saw the claimant on August 4, 1997, at which time the claimant reported that he was feeling better but still experienced pain and stiffness in his left leg with numbness in his toes. Dr. Treacy's examination of the claimant on that date revealed no paraspinal spasms and excellent motor strength, but continued back pain when straight leg raises were attempted. Dr. Treacy signed a note authorizing the claimant to remain off work.

On August 18, 1997, the claimant returned to work duties for the first time since his accident. He performed light-duty and sedentary jobs for Mobil from August 18, 1997, through April 5, 1998.

The claimant saw Dr. Rezin on August 21, 1997. Dr. Rezin recorded that the claimant stated that he continued to have some back and leg pain. Dr. Rezin's examination of the claimant on that date revealed "some pain in the S1 nerve root distribution" and "pain with straight leg raising." Dr. Rezin recommended an EMG to rule out radiculopathy.

On recommendation from Dr. Rezin, Dr. Steven V. Lekah performed EMG/NCV tests upon the claimant on September 10, 1997. In his

report of those tests, Dr. Lekah noted evidence of an "old S1 radiculopathy" and arrived at the following conclusion:

"Normal study. More specifically, there is no evidence of lumbosacral radiculopathy in the left lower extremity and no evidence of neuropathy."

When the claimant next saw Dr. Rezin on September 23, 1997, he still complained of numbness in his left foot and occasional pain in his left leg. Dr. Rezin recommended that the claimant undergo a myelogram and a post-myelogram CT scan.

On October 14, 1997, Dr. Rezin sent a letter to Mobil wherein he opined that the claimant had reached his preinjury state and would not need surgical intervention. He also opined that the symptoms that the claimant experienced were causally related to his work injury. In that letter, Dr. Rezin stated that, other than a restriction against lifting in excess of 50 pounds, the claimant could return to work in a full-duty capacity.

Dr. Rezin next saw the claimant on October 22, 1997, and recorded that he was still complaining of numbness in his left foot. Dr. Rezin recommended that the claimant have an MRI.

At the request of Mobil, the claimant was examined by Dr. Howard Freedberg, an orthopedic surgeon, on October 23, 1997. Dr. Freedberg testified that the claimant reported that, in July 1997, he felt pain in his back when a hose he was holding jerked. The claimant stated that, after that event, the pain in his back became worse and he also developed pain in his left leg and numbness in his left foot and toes. According to Dr. Freedberg, the claimant stated that, on the date of his examination, his back was better and the pain was "pretty much gone." However, the claimant did report hamstring tightness and numbness in his left foot. Dr. Freedberg examined the claimant and testified that he found the claimant's range of motion to be good for someone who had previously undergone surgery, that his reflexes were symmetrically equal, and that his motor strength was normal. Dr. Freedberg stated that the examination did not reveal any tension signs or deficits in any dermatomal distributions. Dr Freedberg also testified that he reviewed the claimant's radiological reports, which revealed degenerative disc disease at L5-S1, fibrotic changes, a left S1 nerve root that was not well visualized, and a decrease in disc height at L5-S1. As a result of his examination of the claimant and a review of his medical records, Dr. Freedberg reported to Mobil that the claimant had reached maximum medical improvement and was capable of medium level work, limiting repeated bending and stooping. It was his opinion at that time that an MRI, a myelogram, or a post-myelogram CT scan was not warranted. Dr. Freedberg testified that there was no

causal connection between the claimant's work-related accident of July 17, 1997, and his back problems. In Dr. Freedberg's opinion, the mechanism of the accident on July 17, 1997, as described by the claimant, is not capable of producing a herniated disc. It was his opinion that the claimant's condition was caused by degenerative disc disease and epidural fibrosis from his 1990 surgery.

Dr. Rezin's note of December 16, 1997, states that Dr. Freedberg's recommendation as to work restrictions for the claimant was "probably indicated." The note also states that Dr. Rezin did not feel that the claimant was in need of surgery.

The claimant next saw Dr. Rezin on February 18, 1998, and complained of worsening back pain, pain in his buttock, pain in his left leg, and numbness in his toes. Dr. Rezin examined the claimant and concluded that he had recurrent left leg complaints. Dr. Rezin again recommended that the claimant have a myelogram and a post-myelogram CT scan and continued to prescribe pain medication for the claimant.

When the claimant saw Dr. Rezin on March 31, 1998, he was still complaining of numbness. Dr. Rezin noted the claimant's persistent left leg pain and indicated that he should go forward with a myelogram and a post-myelogram CT scan.

While working on April 5, 1998, the claimant was called into a supervisor's office and informed that Mobil would no longer offer him light-duty work within the restrictions imposed by Dr. Rezin. The claimant was laid off at that time and had not worked from that date through the arbitration hearing on October 5, 1999.

On April 10, 1998, the claimant underwent a lumbar spine myelogram and post-myelogram CT scan. The myelogram illustrated an abrupt cutoff to the nerve root at L5-S1, but no other irregularities were identified. The CT scan revealed a mild concentric disc bulging at L5-S1 which, at the central to left lateral recess, becomes a focul bulge and herniation, causing loss of contrast to pass into the nerve root sleeve at S1. The remainder of the test results were unremarkable. According to the report of the tests, the results appear to suggest granulation tissue or a scar.

On April 28, 1998, the claimant last saw Dr. Rezin, and continued to complain of pain in his left leg and numbness. According to Dr. Rezin's notes, he was of the opinion that the claimant's options were either to live with his discomfort or undergo an exploration of his S1 nerve root. Although Dr. Rezin was in favor of the more conservative approach, he recommended that the claimant get a second opinion.

On referral from Dr. Rezin, the claimant saw Dr. Frank Phillips, an orthopedic surgeon, on June 8, 1998. In a report of that visit, Dr.

Phillips noted that he examined the claimant and his medical records and concluded that he suffered from a recurrent disc herniation on the left at L5-S1, in addition to scar tissue. He stated that he discussed alternative treatment methods with the claimant and recommended a repeat MRI.

The report of the claimant's repeat MRI, which was performed on June 16, 1998, states that the findings are most consistent with granulation tissues after disc removal. There was also some slight noncontrast enhancing tissue directly adjacent to the posterior aspect of the L5 segment, although it did not appear to impress upon the exiting nerve root. According to the report, the findings are much more prominent on axial examination.

Dr. Phillips next saw the claimant on June 29, 1998. In a report of that visit and his review of the repeat MRI, Dr. Phillips noted that the claimant was suffering from low back pain with left leg sciatic-type symptoms which were precipitated by the claimant's July 1997 work-related event. He reported that the MRI revealed scar tissue at the site of the claimant's previous discectomy and also a recurrent disc herniation to the left at L5-S1. As a consequence of the recurrent disc herniation, Dr. Phillips recommended both a discectomy at L5-S1 and an interbody fusion at the same level.

On September 24, 1998, Dr. Phillips performed the following surgical procedures upon the claimant: (1) a laminectomy and foraminotomy with discectomy at L5-S1; (2) an autogenous iliac crest bone graft harvest; and (3) an L5-S1 interbody fusion using allograft bone dowels. Dr. Phillips reported his surgical finding as a herniated disc on the left at L5-S1 and his post-operative diagnosis as recurrent disc herniation at L5-S1 with discogenic lower back pain.

Post-operatively, the claimant continued to treat with Dr. Phillips. Dr. Phillips authored a report on October 12, 1998, stating that the claimant's back and left leg sciatic-type pain seemed much better, although he continued to complain of paresthesia and dysesthetic pain in both feet. Dr. Phillips opined that the claimant probably had an L5 neuropraxia.

In a report dated November 16, 1998, Dr. Phillips stated that the claimant's back had improved significantly and that he had more feeling in his left foot. Dr. Phillips reported that the claimant had no signs of nerve root tension, but did have difficulty bending his toes.

The claimant was again examined by Dr. Freedberg at the request of Mobil on December 14, 1998. At the time of that examination, the claimant reported a slight pain in his back, a tingling in his right foot and toes, and weakness in his left ankle. Dr. Freedberg noted that, subsequent to the claimant's surgery in September of 1998, he could

not dorsiflex his left toes. After examining the claimant and reviewing his medical records, Dr. Freedberg concluded that the claimant had degenerative disc disease with multiple operative procedures and a residual post-operative neuropraxia. According to his report of that examination, Dr. Freedberg found the claimant more disabled than when he examined him in October of 1997. He reported that light-duty work with a 15-pound weight restriction was appropriate for the claimant and that his bending and twisting should also be limited. Dr. Freedberg reasserted his earlier opinion that the claimant's condition was not causally related to his July 17, 1997, work accident. He opined that the claimant's herniated disc existed prior to July 17, 1997, and that the incident did not change the natural progression of the claimant's degenerative disc disease and epidural fibrosis. Dr. Freedberg testified that the claimant's July 1997 accident produced only a temporary aggravation that dissipated within several months.

On February 1, 1999, Dr. Phillips authored a report stating that the claimant was experiencing little or no back or leg pain, but still had some paresthesia in the L5 distribution on the left and some residual weakness of dorsiflexion in the toes on his left foot. As of that report, Dr. Phillips authorized the claimant to return to work, but restricted him to lifting 25 pounds and no repetitive bending.

On March 12, 1999, Dr. Phillips signed a work status report which restated his work restrictions of February 1. Dr. Phillips also wrote that the claimant would not reach maximum medical improvement until approximately nine months after his surgery.

When deposed on March 22, 1999, Dr. Phillips testified that, in his opinion, the claimant developed "severe acute onset left leg sciatic type pain and numbness" as a result of his July 17, 1997, work-related accident. Although admitting that the claimant had a degenerative disc that was not directly related to his July 1997 injury, Dr. Phillips explained that the July 1997 incident aggravated the claimant's preexisting condition, precipitated his left leg sciatic symptoms, and "resulted in part in him needing surgery." However, when asked whether he anticipated that the claimant would have permanent physical restrictions, Dr. Phillips stated that it was too early to predict.

On April 5, 1999, Dr. Phillips reported that the claimant still had persistent numbness in his feet, some aching in his low back, and intermittent pain in his left leg, "but nothing that was very disabling." On examination, the claimant had good range of lumbar motion, his straight leg raises were negative, he had some weakness on his left side, and his sensation to pinprick was diminished in the L5 distribution.

Dr. Phillips' report of July 9, 1999, states that the claimant was

doing reasonably well, with very little back or leg pain. The claimant still reported weakness around his left foot and ankle, and Dr. Phillips prescribed physical therapy.

When this matter came on for hearing before the arbitrator on October 5, 1999, Mobil objected to proceeding under section 19(b—1), contending that the claimant was capable of working. The objection was overruled and the hearing proceeded.

Among other evidence introduced by the claimant during the arbitration hearing was the evidence deposition of his vocational rehabilitation expert, Susan Entenberg. For our purposes, we need not set forth the substance of Entenberg's testimony in its entirety. We do, however, note that, although Entenberg recommended a vocational rehabilitation plan for the claimant, she admitted that the claimant was capable of finding employment within his physical restrictions without additional training.

Following the hearing, the arbitrator found, *inter alia*, that the claimant sustained an accidental injury on July 17, 1997, arising out of and in the scope of his employment by Mobil. He awarded the claimant TTD benefits under the Act for a period of $82^4/_7$ weeks, representing the period from July 17, 1997, through August 17, 1997, and the period from April 6, 1998, through the date of the arbitration hearing on October 5, 1999. The arbitrator also ordered Mobil to pay the sum of $8,766.65 for medical expenses. Additionally, finding that the claimant is unable to return to his job as a machinist, the arbitrator ordered Mobil to pay the costs associated with an approved plan of vocational rehabilitation for the claimant and to pay the claimant maintenance while he is involved in the vocational rehabilitation plan and, thereafter, during his search for a job.

Mobil sought a review of the arbitrator's decision before the Industrial Commission. In a unanimous decision, the Commission affirmed and adopted the arbitrator's decision. Thereafter, Mobil filed a petition in the circuit court of Will County seeking judicial review of the Commission's decision. The circuit court entered an order confirming the decision, and Mobil instituted this appeal.

█ We first address Mobil's contention that the claimant should not have been afforded a section 19(b—1) hearing. Section 19(b—1) of the Act provides a mechanism whereby an employee who is not receiving medical services as provided by section 8(a) of the Act or compensation as provided by section 8(b) of the Act may petition for an emergency hearing regarding his entitlement to such services or compensation. 820 ILCS 305/19(b—1) (West 1998). Section 19(b—1) provides in pertinent part that:

"Such petition shall contain the following information and shall be served on the employer at least 15 days before it is filed:

* * *

(x) a copy of a signed report by a medical practitioner, relating to the employee's current inability to return to work because of the injuries incurred as a result of the accident or such other documents or affidavits which show that the employee is entitled to receive compensation pursuant to paragraph (b) of Section 8 of this Act or medical, surgical or hospital services pursuant to paragraph (a) of Section 8 of this Act." 820 ILCS 305/19(b—1) (West 1998).

Mobil contends that the claimant was not entitled to a section 19(b—1) hearing because he had been released to work with restrictions and his own vocational expert testified that he was capable of employment without any vocational training. We disagree. As our supreme court held in *Choi v. Industrial Comm'n*, 182 Ill. 2d 387, 695 N.E.2d 656 (1998), a claimant is not required to establish a total inability to perform all work in order to be entitled to a section 19(b—1) hearing. Rather, "the phrase 'inability to return to work,' as used in paragraph (x), should be construed to equate to the term 'temporarily totally disabled.' " *Choi*, 182 Ill. 2d at 396.

With her petition for a section 19(b—1) hearing, the claimant in *Choi* had provided documentation establishing that she could not perform her full duties as a nurse, although she could perform sedentary or light-duty work, which her employer had not provided. *Choi*, 182 Ill. 2d at 389-90. The court found this sufficient to entitle the claimant to a section 19(b—1) hearing. *Choi*, 182 Ill. 2d at 397. At the time the claimant in this case filed his petition for a section 19(b—1) hearing, he had been released to work with restrictions on lifting and bending, which restrictions prevented him from performing his full duties, and Mobil was not providing him with a light-duty position. Under *Choi*, the claimant was entitled to a section 19(b—1) hearing.

Mobil next argues that a number of the Commission's findings are against the manifest weight of the evidence, namely, its findings that: (1) the claimant sustained an accidental injury arising out of and in the course of his employment; (2) the claimant's condition of ill-being is causally connected to that work-related injury; and (3) the claimant is entitled to an award of TTD benefits for a period of $82^4/7$ weeks. Again, we disagree.

■ It is the function of the Commission to decide questions of fact and causation, to judge the credibility of the witnesses, and to resolve conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). Although we might draw different inferences from the facts, the findings of the Commission will not be reversed unless they are against the manifest weight of the evidence.

*Orsini v. Industrial Comm'n,* 117 Ill. 2d 38, 44, 509 N.E.2d 1005 (1987).

Mobil does not argue that the Commission's finding that the claimant sustained an accidental injury arising out of and in the course of his employment is unsupported by the evidence. Rather, it argues that the finding is against the manifest weight of the evidence because the arbitrator erred in sustaining the claimant's motion to bar the testimony of three witnesses which Mobil failed to disclose in response to the claimant's section 19(b—1) petition.

■ Evidentiary rulings made during the course of a workers' compensation case will not be disturbed on review absent an abuse of discretion. See *Gotter v. Industrial Comm'n,* 152 Ill. App. 3d 822, 828, 504 N.E.2d 1277 (1987). Section 19(b—1) of the Act provides in pertinent part that "[n]o document or other evidence not previously identified by either party with the petition or written response, or by any other means before the hearing, may be introduced into evidence without good cause." 820 ILCS 305/19(b—1) (West 1998). In its brief before this court, Mobil does not even contend that it had good cause for failing to list the three witnesses in response to the claimant's petition. The history of the incident given by the claimant to Mobil and to his physicians was consistent. Mobil always knew that the claimant asserted that he sustained an injury on July 17, 1997, when a hose he was holding jerked back. Mobil cannot seriously contend that it was surprised by the fact that the claimant was asserting that his injury was sustained out of and in the course of his employment, especially in light of Dr. Phillips' deposition testimony, which was given in excess of six months prior to the arbitration hearing. When Mobil filed its response to the claimant's section 19(b—1) petition, it never disclosed the three witnesses it now claims could have offered evidence relevant to the question of whether the claimant sustained an injury which arose out of and in the course of his employment, nor did it seek to amend that response to make the disclosure at any time prior to the arbitration hearing. Further, Mobil has shown no good cause for having failed to follow either course of action. As a consequence, there was no abuse of discretion in barring the witnesses from testifying. *Fermi National Accelerator Lab v. Industrial Comm'n,* 224 Ill. App. 3d 899, 911-12, 586 N.E.2d 750 (1992); *Connell v. Industrial Comm'n,* 170 Ill. App. 3d 49, 56-57, 523 N.E.2d 1265 (1988).

■ Mobil's contention that the Commission's finding on the issue of causation is against the manifest weight of the evidence must also fail. Whether a causal relationship exists between a claimant's employment and his condition of ill-being is a question of fact to be decided by the Commission. *Certi-Serve, Inc. v. Industrial Comm'n,* 101 Ill. 2d

236, 244, 461 N.E.2d 954 (1984). In this case, the Commission accepted the causation opinions of Dr. Phillips and rejected those of Dr. Freedberg. In so doing, the Commission resolved a conflict in medical evidence, as is its function. Dr. Phillips testified to the causal connection between the claimant's condition of ill-being and his work-related accident of July 17, 1997. As an opposite conclusion is not clearly evident, we cannot say that the Commission's determination on the issue of causation is against the manifest weight of the evidence.

■ Mobil next argues that the Commission's finding that the claimant is entitled to TTD benefits for the period of 82⁴/₇ weeks is against the manifest weight of the evidence. The issues of whether a claimant is temporarily totally disabled and the length of time for which he is entitled to TTD benefits are questions of fact to be resolved by the Commission. *Archer Daniels Midland Co. v. Industrial Comm'n*, 138 Ill. 2d 107, 118-19, 561 N.E.2d 623 (1990); *Sorenson v. Industrial Comm'n*, 281 Ill. App. 3d 373, 385, 666 N.E.2d 713 (1996). An employee is temporarily totally disabled from the time that an injury incapacitates him from work until such time as he is as far recovered or restored as the permanent character of his injury will permit. *Archer Daniels Midland Co.*, 138 Ill. 2d at 118. Once an injured employee's physical condition stabilizes, he is no longer eligible for TTD benefits. *Archer Daniels Midland Co.*, 138 Ill. 2d at 118.

In this case, the Commission awarded the claimant 82⁴/₇ weeks of TTD benefits, representing the periods that the claimant was off work from July 17, 1997, through August 17, 1997, and April 6, 1998, through October 5, 1999. Mobil argues that there is "no support in the record for a claim of *temporary total* disability after February 1, 1999, when Dr. Phillips released Haberkorn to return to work with a twenty-five pound lifting restriction." We disagree.

Although Dr. Phillips released the claimant to return to light duty work on February 1, 1999, in a work status report dated March 12, 1999, Dr. Phillips wrote that the claimant would not reach maximum medical improvement until approximately nine months after his surgery, or July of 1999. On March 22, 1999, Dr. Phillips testified that it was too early to predict whether the claimant would have permanent physical restrictions. On July 9, 1999, Dr. Phillips reported that the claimant still had weakness in his left foot and ankle and that he was prescribing additional physical therapy. When the claimant testified on October 5, 1999, he stated that he was still experiencing low back pain on lifting, numbness in his left foot, weakness in his left ankle, less than full extension in the toes on his left foot, and difficulty balancing. The claimant stated that he finished physical therapy several weeks prior to the arbitration hearing and continued follow-up

care with Dr. Phillips. According to the claimant, he had a repeat CT scan approximately one week prior to the arbitration hearing and was scheduled to see Dr. Phillips on October 15, 1999.

The fact that the claimant may have been able to perform light-duty work does not necessarily preclude a finding that he was temporarily totally disabled. *Whitney Productions, Inc. v. Industrial Comm'n*, 274 Ill. App. 3d 28, 31, 653 N.E.2d 965 (1995). We believe that the evidence in this record is sufficient to support a finding that, as of the date of the arbitration hearing, the claimant's condition had not stabilized, he was still receiving medical treatment, and he had not reached maximum medical improvement. As a consequence, we do not find the Commission's decision to award $82^4/7$ weeks of TTD benefits to be against the manifest weight of the evidence.

■ Next, we address the question of the propriety of the Commission having ordered vocational rehabilitation benefits and maintenance as part of an award made after a hearing on a section 19(b—1) petition.

Section 19(b—1) of the Act affords an injured employee a means to petition for an emergency hearing. In pertinent part, the statute provides that

> "[i]f the employee is not receiving medical, surgical or hospital services as provided in paragraph (a) of Section 8 or compensation as provided in paragraph (b) of Section 8, the employee, in accordance with Commission Rules, may file a petition for an emergency hearing by an Arbitrator *on the issue of whether or not he is entitled to receive payment of such compensation or services as provided therein.*" (Emphasis added.) 820 ILCS 305/19(b—1) (West 1998).

Statutory interpretation is a question of law, which, on review, we address *de novo. Choi v. Industrial Comm'n*, 182 Ill. 2d at 392. Our goal is to ascertain and give effect to the intent of the legislature (*Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189, 561 N.E.2d 656 (1990)), the best indication of which is the language of the statute, given its plain and ordinary meaning (*Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479, 639 N.E.2d 1282 (1994)).

Two separate sections of the Act provide the statutory basis for an award of vocational rehabilitation benefits to an injured worker. Section 6(d) provides that "[e]very employer shall notify each injured employee who has been granted compensation under the provisions of Section 8 of this Act of his rights to rehabilitation services and advise him of the locations of available public rehabilitation centers and any other such services of which the employer has knowledge." 820 ILCS 305/6(d) (West 1998). Section 8(a) states that, in addition to providing and paying for all necessary first aid, medical, surgical and hospital

services incurred by an injured employee, the employer "shall also pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto." 820 ILCS 305/8(a) (West 1998).

By its plain language, section 19(b—1) provides that the issues to be resolved at an emergency hearing are the employee's right to receive payment for TTD under section 8(b) (see *Choi*, 182 Ill. 2d at 393) and payment for medical, surgical, or hospital services as provided in section 8(a). The statute does not provide for any resolution of the employee's right to either notice of rehabilitation services under section 6(d) or vocational rehabilitation benefits and maintenance under section 8(a). Even if one were to assume that the language of the statute is ambiguous on the point, application of the doctrine of *expressio unius est exclusio alterius* would support a similar conclusion. Where, as here, a statute specifies the matters to which it applies, there is an inference that all omissions should be understood as exclusions. *Bridgestone/Firestone, Inc. v. Aldridge* 179 Ill. 2d 141, 151-52, 688 N.E.2d 90 (1997).

We are aware of a number of cases in which Illinois courts have addressed the question of whether the Commission's award of vocational rehabilitation services after a section 19(b—1) hearing was against the manifest weight of the evidence. However, those cases did not address the question of statutory construction presented here. For the reasons stated, we find that vocational rehabilitation benefits and maintenance may not be awarded as relief in a hearing conducted pursuant to section 19(b—1) of the Act and that the Commission's award of such benefits in this case must be vacated, without prejudice to the claimant's right to seek such benefits on remand.

Because of our resolution of the preceding issue, we need not address the question of whether the Commission's award of vocational rehabilitation benefits was against the manifest weight of the evidence.

For the foregoing reasons, we vacate that portion of the Commission's decision which awarded the claimant vocational rehabilitation benefits and maintenance, without prejudice to his right to seek such relief on remand, and reverse that portion of the circuit court's order which confirmed the Commission's award of vocational rehabilitation benefits and maintenance. We affirm that portion of the circuit court's order which confirmed the Commission's award of TTD benefits and $8,766.65 for medical expenses. This cause is remanded to the Commission for further proceedings.

Circuit court order affirmed in part and reversed in part; Commission decision vacated in part; cause remanded to the Commission.

McCULLOUGH, P.J., and O'MALLEY, HOLDRIDGE, and RARICK, JJ., concur.